CASE NO. 12-1172

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

THE NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS,

*Petitioner*,

v.

FEDERAL TRADE COMMISSION,

*Respondent*.

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL TRADE COMMISSION

_____

**PETITIONER'S PAGE PROOF OPENING BRIEF**

_____

Noel L. Allen
M. Jackson Nichols
Catherine E. Lee
Nathan E. Standley
Brenner A. Allen, of counsel
ALLEN, PINNIX & NICHOLS, P.A.
Post Office Drawer 1270
Raleigh, North Carolina 27602
Telephone:  919-755-0505
Facsimile:  919-829-8098
Email:  nallen@allen-pinnix.com
        mjn@allen-pinnix.com
        clee@allen-pinnix.com
        nstandley@allen-pinnix.com
        baa@allen-pinnix.com

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. _____       Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO

2.    Does party/amicus have any parent corporations?              YES    NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?              YES    NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES     NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)      YES     NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                            YES     NO
       If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
***************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
          (signature)                                          (date)

11/17/2011
SCC

# TABLE OF CONTENTS

Table of Authorities ..................................................................................v

Statement of Subject Matter and Appellate Jurisdiction ...........................1

Statement of Issues....................................................................................1

Statement of Case......................................................................................2

Statement of Facts .....................................................................................5

    A.    NCSBDE and the NCDPA ...................................................5

    B.    Background of Health and Safety Concerns Surrounding Illegal Teeth-Whitening............................................................8

    C.    NCSBDE's Investigations Procedures ................................11

    D.    Based on *Prima Facie* Evidence of Violations, NCSBDE Sent C&Ds, Which Did Not Stop Lawful Activities ................12

    E.    Information to Mall Operators and Cosmetology Board ....14

    F.    Erroneous Findings of Fact Regarding Concerted Action and Financial Interest ........................................................16

Summary of Argument...............................................................................17

Argument...................................................................................................19

I.    Standard of Review.........................................................................19

    A.    FTC Erred in Denying NCSBDE's Motion to Dismiss ......19

    B.    FTC Erred in Granting CC's Motion for Partial Summary Decision............................................................................20

C.  FTC's Holding on State Action Immunity Is Not Entitled to Deference .......................................................................... 20

D.  FTC's Opinion and Final Order Are Not Entitled to Deference ......... 21

II.  FTC LACKS JURISDICTION OVER NCSBDE ................................... 23

III.  NCSBDE IS ENTITLED TO STATE ACTION IMMUNTY ..................... 24

A.  NCSBDE's Challenged Actions Enforced a Clearly-Articulated State Law ............................................................................. 25

1.  NCSBDE Enforced a State Law—Not a Rule, and Not an Internal Policy ...................................................................... 26

2.  NCDPA Is Clearly-Articulated, Regardless of Whether It Expressly Authorizes the Challenged Actions ........................ 26

3.  NCDPA Prohibits Unlicensed Persons from Providing Teeth-Whitening Services ................................................................ 28

B.  NCSBDE Is Not Required to Demonstrate Active Supervision to Qualify for State Action Immunity ............................ 30

1.  State Boards Acting Pursuant to State Law Always Are Granted Immunity; Cases Cited by FTC Are Distinguishable ...................................................................... 31

a.  FTC Relies on Cases Where a State Agency Acted Pursuant to an Internal Rule or a Private Association Policy, Not a State Law ................................................... 35

b.  FTC Relies on Cases Where Active Supervision of a Private Association, Not a State Agency, Is at Issue ...... 36

2.  If Active Supervision Were Required to Establish State Action Immunity, Such Supervision Existed .......................... 38

3.  FTC's Attempt to Assert Itself as the "Active Supervisor" over a State and Its Agencies Is Neither Warranted Nor Legal ........ 39

iii

IV.   NCSBDE DID NOT AND COULD NOT ENGAGE IN CONCERTED
      ACTION ....................................................................................41

      A.   NCSBDE Is Not Capable of Engaging in Concerted Action.............43

      B.   NCSBDE Did Not Actually Engage in Concerted Action..................47

           1.   CC Did Not Prove that NCSBDE Had a Conscious
                Commitment to a Common Scheme Designed to Achieve
                an Unlawful Objective ...............................................................47

           2.   Evidence Did Not Tend to Exclude the Possibility that
                NCSBDE Acted Independently ..................................................49

V.    NCSBDE DID NOT UNREASONABLY RESTRAIN TRADE .................54

      A.   NCSBDE Did Not Restrain Trade in the Relevant Market ...............54

      B.   NCSBDE's Actions Are Legal Under a "Quick Look" Rule of
           Reason Test ..........................................................................55

      C.   NCSBDE's Actions Are Legal Under a Traditional Rule of Reason
           Test .....................................................................................56

           1.   NCSBDE's Enforcement of State Law Does Not Violate
                the Rule of Reason Because It Was Mandated for Public
                Protection ...............................................................................57

           2.   Procompetitive Justification Cases Relied on by FTC Are
                Distinguishable.........................................................................59

Conclusion ..............................................................................................60

Request for Oral Argument.........................................................................60

Certificate of Compliance ..........................................................................62

Certificate of Service ................................................................................63

Addendum ........................................................................................................64

# TABLE OF AUTHORITIES

## Cases

*Allied Tube & Conduit Corp. v. Indian Head,*
    486 U.S. 492 (1988)..........................................................................56

*Am. Chiropractic v. Trigon Healthcare,*
    367 F.3d 212 (4th Cir. 2004) ...............................................................48

*Am. Cyanamid Co. v. FTC,*
    363 F.2d 757 (6th Cir. 1966) ...............................................................22

*Am. Needle, Inc. v. NFL,*
    130 S. Ct. 2201 (2010)........................................................... 42, 43, 45

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)...................56

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
    452 U.S. 490 (1981) ......................................................................... 22

*Ariz. v. Maricopa County Med. Soc'y,*
    457 U.S. 332 (1982)....................................................................... 57, 58

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................19

*Asheville Tobacco Board of Trade v. FTC,*
    263 F.2d 502 (4th Cir. 1959) ........................................................ 25, 37

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
    155 F.3d 59 (2d Cir. 1998) ..................................................................34

*Bankers Insurance Co. v. Florida Residential Property & Casualty Joint*
    *Underwriting Ass'n*, 137 F.3d 1293 (11th Cir. 1998) ................................. 32, 33

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977)...........................................................................34

*Bd. of Trade v. United States*,
    246 U.S. 231 (1918)...........................................................................54

vi

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................19

*Benrus Watch Co. v. FTC*,
  352 F.2d 313 (8th Cir. 1965) ..................................................................22

*Brazil v. Ark. Bd. of Dental Exam'rs*,
  593 F. Supp. 1354 (E.D. Ark. 1984),
  *aff'd*, 759 F.2d 674 (8th Cir. 1985) .......................................... 26, 31, 32

*Calif. Retail Liquor Dealers Ass'n v. Midcal*,
  445 U.S. 97 (1980) ..................................................................................25

*Calif. State Bd. of Optometry v. FTC*,
  910 F.2d 976 (D.C. Cir. 1970) ......................................... 23, 25, 34, 40

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
  810 F.2d 869 (9th Cir. 1987) ..................................................................34

*City of Columbia v. Omni Outdoor Adver.*,
  499 U.S. 365 (1991) ................................................................................26

*Coastal Neuro-Psych v. Onslow Mem'l*,
  795 F.2d 340 (4th Cir. 1986) ................................................................. 27

*Cohn v. Bond*,
  953 F.2d 154 (4th Cir. 1991) ..................................................................27

*Concord v. Boston Edison Co.*,
  915 F.2d 17 (1st Cir. 1990)......................................................................57

*Cooper v. Forsyth County Hosp. Auth.*,
  789 F.2d 278 (4th Cir. 1986) ....................................................... 48, 52, 53

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ............................................................................... 42

*Deak-Perera Haw., Inc. v. Dep't of Transp.*,
  745 F.2d 1281 (9th Cir. 1984) ................................................................34

*Dent v. West Virginia*,
  129 U.S. 114 (1889) ............................................................................... 60

*Dickson v. Ebert*,
    309 F.3d 193 (4th Cir. 2002) ................................................................49

*Earles v. State Board of Certified Public Accountants of Louisiana*,
    139 F.3d 1033 (5th Cir. 1998) ................................................ 31, 33, 34

*Flav-O-Rich, Inc. v. N.C. Milk Comm'n*,
    593 F. Supp. 13 (E.D.N.C. 1983) .......................................................38

*FTC v. Curtis Publ'g Co.*,
    260 U.S. 568 (1923)............................................................................22

*FTC v. Hosp. Bd. of Dirs.*,
    38 F.3d 1184 (11th Cir. 1994) ............................................................27

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)............................................................................21

*FTC v. Klesner*,
    280 U.S. 19 (1929)..............................................................................20

*FTC v. Monahan*,
    832 F.2d 688 (1st Cir. 1987)............................................................... 35

*FTC v. Phoebe Putney Health Sys.*,
    663 F.3d 1369 (11th Cir. 2011) ..........................................................27

*FTC v. Swish Mktg.*,
    No. C09-03814, 2010 U.S. Dist. LEXIS 15016 (N.D. Cal. Feb. 22, 2010) .........20

*Gambrel v. Kentucky Board of Dentistry*,
    689 F.2d 619 (6th Cir. 1982) ......................................................... 39, 58

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975).................................................................. 25, 35, 60

*Graves v. Minnesota*,
    272 U.S. 425 (1926)............................................................................60

*Hass v. Oregon State Bar*,
    883 F.2d 1453 (9th Cir. 1989) ................................................ 32, 33, 34

*Indiana Federation*,
   476 U.S. 447 (1986) ........................................................................ 57, 59

*Ky. Household Goods Carrier Ass'n*,
   139 F.T.C. 404 (2005) ...........................................................................39

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
   924 F.2d 539 (4th Cir. 1991) ......................................................... 43, 47

*Mass. Bd. of Registration in Optometry*,
   110 F.T.C. 549, 1988 FTC LEXIS 34 (1988).................................... 35-36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................ 49-50

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
   No. 98-2847, 1999 U.S. App. LEXIS 21487 (4th Cir. Sept. 7, 1999) .................50

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)................................................... 43, 47, 50, 52, 53

*Nassimos v. Bd of Exam'rs of Master Plumbers*,
   No. 94-1319, 1995 U.S. Dist. LEXIS 21376  (D.N.J. Mar. 31, 1995),
   *aff'd*, 74 F.3d 1227 (3d Cir. 1995), *cert. denied*, 517 U.S. 1244 (1966) ....... 25, 34

*National Society of Professional Engineers*,
   435 U.S. 679 (1978)...............................................................................60

*Nemours & Co.*, 951 F.2d 617 (4th Cir. 1991) ......................................51

*Neo Gen Screening Inc. v. New England Newborn Screening Program*,
   187 F.3d 24 (1st Cir. 1999)....................................................................34

*New England Motor Rate Bureau, Inc. v. FTC*,
   908 F.2d 1064 (1st Cir. 1990)........................................................ 21, 24

*New York v. United States*,
   505 U.S. 144 (1992)...............................................................................23

*Norman's on the Waterfront, Inc. v. Wheatley*,
   444 F.2d 1011 (3d Cir. 1971) ........................................................ 37, 38

ix

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696 (4th Cir. 1991) ......................................................... 42, 51

*Orkin Exterminating Co. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988) ...........................................................20

*Parker v. Brown*,
    317 U.S. 341 (1943)........................................................ 23, 24, 25, 30

*Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*,
    878 F.2d 801 (4th Cir. 1989) ................................................ 50, 51, 52, 53

*Penasquitos Village, Inc. v. NLRB*,
    565 F.2d 1074 (9th Cir. 1977) ............................................................22

*Pocono Invitational Sports Camp, Inc. v. NCAA*,
    317 F. Supp. 2d 569 (E.D. Pa. 2004)....................................................58

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005)...............................................................55

*Porter Testing Lab. v. Bd. of Regents for Okla. Agric. & Mech. Colleges*,
    993 F.2d 768 (10th Cir. 1993) ............................................................27

*Precision Piping & Instruments, Inc. v. E.I. DuPont de Nemours & Co.*,
    951 F.2d 617 (4th Cir. 1991) ..............................................................51

*Preferred Sites LLC v. Troup County*,
    296 F.3d 1210 (11th Cir. 2002) ..........................................................22

*Printz v. United States*,
    521 U.S. 898 (1997)..........................................................................23

*Saenz v. Univ. Interscholastic League*,
    487 F.2d 1026 (5th Cir. 1973) ............................................................34

*Soadjede v. Ashcroft*,
    324 F.3d 830 (5th Cir. 2003) ..............................................................21

*Spiegel, Inc. v. FTC*,
    540 F.2d 287 (7th Cir. 1976) ..............................................................21

*Temple Anthracite Coal Co. v. FTC,*
  51 F.2d 656 (3d Cir. 1931) ...................................................................21

*Thiret v. FTC,*
  512 F.2d 176 (10th Cir. 1975) .............................................................22

*Thompson Everett, Inc. v. National Cable Advertising,*
  57 F.3d 1317 (4th Cir. 1995) ........................................................ 48, 49

*Town of Hallie v. City of Eau Claire,*
  471 U.S. 34 (1985)............................................................... *passim*

*Toys R Us, Inc. v. FTC,*
  221 F.3d 928 (7th Cir. 2000) ...............................................................22

*United States v. Am. Tobacco Co.,*
  221 U.S. 106 (1911)..............................................................................57

*United States v. Brown Univ.,*
  5 F.3d 658 (3d Cir. 1993) ...................................................................57

*United States v. Gen. Motors Corp.,*
  384 U.S. 127 (1966)..............................................................................36

*Viazis v. Am. Ass'n of Orthodontists,*
  314 F.3d 758 (5th Cir. 2002) ........................................................ 53, 54

*Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,*
  624 F.2d 476 (4th Cir. 1980) ...............................................................59

*Washington State Electrical Contractors Ass'n v. Forrest,*
  930 F.2d 736 (9th Cir. 1991) ......................................................... 36

**Statutes**

5 U.S.C. §706.........................................................................................22

15 U.S.C. §45(a) ............................................................................ 1, 23

15 U.S.C. §45(b) ...................................................................................1

15 U.S.C. §45(c) ............................................................................ 1, 21

N.C. Const. art I ....................................................................................44

N.C. Const. art. VI .............................................................................. 7, 33

21 NCAC 16J.0103 ............................................................................. 10

N.C.G.S. § 14-230 .......................................................................... 7, 44

N.C.G.S. § 55B-9 ............................................................................... 10

N.C.G.S. § 90-22 .................................................................. 5, 6, 28, 44

N.C.G.S. § 90-29 .......................................................................... *passim*

N.C.G.S. § 90-40 .......................................................................... 5, 12, 15

N.C.G.S. § 90-41 ............................................................................. 7, 8

N.C.G.S. § 93B-5(g) ........................................................................ 44

N.C.G.S. § 93B-16(b) ....................................................................... 6

N.C.G.S. § 93B-16(c) ....................................................................... 7

N.C.G.S. § 120-76(1)(d) ................................................................... 7

N.C.G.S. § 138A-10 .......................................................................... 8

N.C.G.S. § 138A-12(o) ...................................................................... 8

N.C.G.S. § 138A-14(b) ................................................................. 7, 44

N.C.G.S. § 138A-15(d) ...................................................................... 7

N.C.G.S. § 138A-21-27 ..................................................................... 44

N.C.G.S. § 138A-31 .......................................................................... 44

N.C.G.S. § 138A-34........................................................................... 44

N.C.G.S. § 138A-39(a) ................................................................. 7, 44

N.C.G.S. § 138A-45(q) .................................................................. 44

N.C.G.S. § 143-318.9 .................................................................... 44

N.C.G.S. § 143-300.3 ...................................................................... 7

N.C.G.S. § 233 ............................................................................. 12

## Other Authority

Areeda, *Antitrust Law* (Supp. 1982) ....................................... 29, 40, 43

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The Federal Trade Commission ("FTC") claimed jurisdiction under 15 U.S.C. §45(a) and brought proceedings against the North Carolina State Board of Dental Examiners ("NCSBDE") under 15 U.S.C. §45(b).  This appeal is from the underlying prior orders and final Opinion and Order of the Federal Trade Commission ("Opinion" and "Final Order"), dated December 2, 2011, and served (by mail) on NCSBDE on December 14, 2011.  NCSBDE filed a timely Petition for Review on February 10, 2012.  This Court has jurisdiction under 15 U.S.C. §45(c).

## STATEMENT OF ISSUES

1.    What standard of review must be applied?

    a.    Did FTC err in denying NCSBDE's, and granting Complaint Counsel's, dispositive motions?

    b.    Are FTC's findings and conclusions entitled to deference?

2.    Does FTC have jurisdiction over NCSBDE for purposes of the FTC Act?

3.    Is NCSBDE's enforcement of clearly-articulated state statutes, as required by law, entitled to immunity?

    a.    Must a state agency acting pursuant to clearly-articulated state statutes demonstrate active supervision to establish state action immunity?

1

b.     If NCSBDE must demonstrate active supervision, did NCSBDE do so?

c.     Does FTC unconstitutionally preempt state law by serving as "active supervisor" over NCSBDE?

4.    If NCSBDE's actions are not immune by the state action doctrine, did FTC prove that NCSBDE engaged in concerted action?

a.     Is NCSBDE capable of engaging in unlawful concerted action?

b.     Did NCSBDE actually engage in unlawful concerted action?

c.     Did FTC's findings turn NCSBDE into an unlawful *de facto* conspiracy?

5.    If NCSBDE's actions are not immune by the state action doctrine, did FTC prove that NCSBDE unreasonably restrained trade?

a.     Is a state agency's enforcement of state law subject to an inherently suspect analysis and, under such circumstances, does NCSBDE bear the burden to prove a procompetitive justification?

b.     Under a rule of reason analysis, are NCSBDE's actions to enforce state public protection statutes justified?

## STATEMENT OF CASE

In its June 17, 2010 administrative complaint ("Complaint"), FTC alleged that "dentists in North Carolina" acting through NCSBDE, violated Section 5 of

2

the Federal Trade Commission Act ("FTCA") by "colluding" and conspiring with "the dentists of North Carolina" to prevent non-dentist competition. FTC defined the relevant market in the Complaint as teeth-whitening services "offered by dentists and non-dentists." FTC alleged, that although NCSBDE was a "state agency," the licensee members who constituted a majority of NCSBDE were competitors motivated by personal financial interests to unreasonably restrain trade "without any legitimate justification or defense."

On July 6, 2010, NCSBDE denied each allegation except that it is a "state agency." NCSBDE asserted its state action immunity, denied it was a "person" subject to FTC's jurisdiction, and cited a statute which explicitly prohibited non-licensees from offering or rendering the service of "removal of stains from teeth."

On November 8, 2010, NCSBDE moved to dismiss based on state action immunity, and Complaint Counsel ("CC") moved for partial summary decision on that issue.

On January 14, 2011, NCSBDE moved to change the hearing location from Washington, DC to Raleigh, NC, because 27 of the 37 proposed trial witnesses were NC residents, **none** were located in DC, and NCSBDE's office is in NC. FTC denied this motion on January 25, 2011.

On January 14, 2011, NCSBDE moved to disqualify FTC on grounds that by approving the Complaint (including the lack of state action), FTC pre-judged the

3

essential issues in the administrative proceeding. On February 3, 2011, FTC denied NCSBDE's motion and granted partial summary decision against NCSBDE on the state action issue, and denied the motion for disqualification.

The administrative trial commenced February 17, 2011 and concluded March 16, 2011. NCSBDE moved to dismiss at the close of CC's evidence. That motion was denied. On July 14, 2011, Administrative Law Judge ("ALJ") Michael Chappell rendered his Initial Decision that NCSBDE violated Sherman Act §1 and FTCA §5.

NCSBDE appealed the ALJ's Initial Decision to the full Commission on July 28, 2011. FTC entered its Opinion and Final Order on December 7, 2011, denying NCSBDE's appeal. On January 13, 2012, NCSBDE applied for Stay of FTC's Order. FTC granted that Stay on February 10, 2012.

On February 3, 2011, NCSBDE filed an action in the U.S. District Court for the Eastern District of North Carolina, seeking declaratory judgment regarding the violation of NCSBDE's constitutional rights and seeking to restrain and enjoin FTC from further illegal administrative action.[1] That action raises significant constitutional issues not within the jurisdiction or competence of an administrative tribunal: whether a state has recourse in court before undergoing an administrative trial before an agency acting without legal authority and in violation of due process

---

[1] *N.C. State Bd. of Dental Exam'rs v. FTC*, No. 5:11-CV-00049-FL.

4

and federalism principles, the Tenth Amendment, and the Commerce Clause. The District Court denied the TRO on February 9, 2011, and dismissed the suit for lack of subject matter jurisdiction on May 3, 2011. An appeal is before this Court, Case No. 11-1679.

**STATEMENT OF FACTS**

NCSBDE's (1) Proposed Findings of Fact, Conclusions of Law, and Order, as Amended; (2) Appeal Brief; and (3) Reply Brief, from the administrative proceeding describe facts uncontroverted by evidence of record and are incorporated herein by reference. Yet, few of NCSBDE's proposed findings of fact were adopted by the ALJ or FTC.

**A.    NCSBDE and the NCDPA**

The North Carolina General Assembly ("Legislature") enacted N.C.'s Dental Practice Act ("NCDPA") to protect the "public health, safety, and welfare," ensuring that "only qualified persons be permitted to practice dentistry in the State." N.C.G.S. §90-22 *et seq.*; N.C.G.S. §90-40. NCDPA must "be liberally construed to carry out these objects and purposes." N.C.G.S. §90-22(a). NCDPA defines dentistry:

> …

> (b) A person shall be deemed to be practicing dentistry in this State who does, undertakes or attempts to do, or claims the ability to do any one or more of the following facts or things which, for the purposes of this Article, constitute the practice of dentistry:

5

…

 (2) Removes stains, accretions or deposits from the human teeth;

…

 (7) Takes or makes an impression of the human teeth, gums or jaws;

…

 (10) Performs or engaged in any of the clinical practices included in the curricula of recognized dental schools or colleges;

 (11) Owns, manages, supervises, controls or conducts, either himself or by and through another person or other persons, any enterprise wherein any one or more of the acts or practices set forth in subdivisions . . . above are done, attempted to be done, or represented to be done; and

…

 (13) Represents to the public, by any advertisement or announcement, by or through any media, the ability or qualification to do or perform any of the acts or practices set forth in subdivisions  . . . above.

N.C.G.S. §90-29(a), (b)(2), (b)(7), (b)(10), (b)(11), and (b)(13).

NCSBDE is a state agency, charged with regulating dentistry in North Carolina pursuant to NCDPA.  Joint Stipulation of Fact, ¶1; N.C.G.S. §90-22(a). NCSBDE is an occupational licensing board, subject to N.C.G.S. Chapter 93B. NCSBDE members are "public officials," have sovereign immunity, and "shall be considered state employees…"  N.C.G.S. §93B-16(b).  NCSBDE, its members, and staff are entitled to sovereign immunity and legal defense by the Attorney

General.  N.C.G.S. §93B-16(c); N.C.G.S. §143-300.3.  NCSBDE members' failure to discharge duties could be a crime.  N.C.G.S. §14-230.

A majority of NCSBDE's members be licensed dentists, N.C.G.S. §90-22(b), who must take an oath to uphold N.C.'s laws and protect the health, safety, and welfare of the public.  N.C. CONST. art. VI, §7.  Accordingly, they must investigate and act against violations of NCDPA.[2]  N.C.G.S. §90-41.  They receive biennial ethics training, and take an ethics course within six months of election.[3]  N.C.G.S. §138A-14(b).  NCSBDE is subject to continuing review by the Joint Legislative Commission on Governmental Operations which has the power to study state agency activities regarding "conformity with legislative intent.  N.C.G.S. §120-76(1)(d).

NCSBDE must routinely remind members not to participate in any matter if they have a potential conflict of interest.[4]  N.C.G.S. §138A-15(d).  As "public servants," they "shall eliminate the interest that constitutes the disqualifying conflict of interest or resign from the public position."  N.C.G.S. §138A-39(a).

---

[2] Wester, Tr. 1280; Owens, Tr. 1440, 1474-1475; White, Tr. 2197; Hardesty, Tr. 2763-2766; CX25-1; CX28-1; CX219-1; CX242-1; CX449-1; CX450-1.

[3] Wester, Tr. 1278; Owens, Tr. 1436-1437; White, Tr. 2194, 2208; Hardesty, Tr. 2762; RX52 (Burnham, Dep. 70); RX63 (Holland, Dep. 32-33).

[4] NCSBDE members were reminded of this obligation at every meeting.  Wester, Tr. 1280; Owens, Tr. 1438; White, Tr. 2197, 2208-2209; Hardesty, Tr. 2763-2764; RX51 (Brown, Dep. 101-102); RX56 (Feingold, Dep. 49); RX63 (Holland, Dep. 35); RX65 (Morgan, Dep. 127).

The State's Ethics Commission may punish conflict of interest violations. N.C.G.S. §§138A-10, 12(o). NCSBDE members understand and comply.[5]

## B. Background of Health and Safety Concerns Surrounding Illegal Teeth-Whitening

North Carolina's Legislature mandates that NCSBDE enforce NCDPA to protect the public from the dangers of illegal stain removal from teeth. The Legislature does not require NCSBDE to show actual harm before enforcing NCDPA.[6] N.C.G.S. §90-41. Nevertheless, NCSBDE presented substantial evidence of potential and actual harm to consumers of illegal teeth-whitening services.

One consumer testified that his gums bled and sloughed off after his teeth were whitened at a mall kiosk, causing him several days of intense pain.[7] A dentist who later examined the consumer testified that the consumer's gums were chemically burned.[8] Another consumer whose teeth were whitened at a tanning salon developed extremely irritated gums, ulcers, and possible permanent nerve damage.[9] Two other consumers reported similar injuries after visiting the same

---

[5] *See, e.g.*, RX52 (Burnham, Dep. 72-73); RX63 (Holland, Dep. 35-38); RX65 (Morgan, Dep. 127-128) and CX572 (Wester, Dep. 50-52).
[6] RX51 (Brown, Dep. 222); RX50 (Bakewell, Dep. 181-82*).*
[7] RX5-4; RX 72 (Runsick, Dep. 60-61); Runsick Tr. 2111-13.
[8] RX5-1, 4; RX73 (Tilley, Dep. 113-115, 139-140).
[9] RX21-4-7; RX71 (Hasson, Dep. 60, 62-63, 85-87).

kiosk.[10]  One consumer reported "a burn or reaction"; the other developed blisters inside her lips.[11]

Unlicensed individuals, whether kiosk or salon operators, do not have the expertise or training to properly make diagnoses of preexisting pathological conditions.[12]  Illegal teeth-whitening may mask preexisting pathological conditions, causing improper dental treatment.[13]  Even FTC's own industry witnesses admitted the serious medical dangers of teeth-whitening.[14]

Stain removal services are safer when provided under dental supervision.[15] Dentists have a professional obligation to protect their patients' safety; they take safety precautions that are not required of illegal dental service providers.[16] Dentists perform a thorough medical examination of teeth-whitening candidates to screen out those with conditions that would contraindicate teeth-whitening. Dentists are required to ensure that sanitation, sterilization, and safety procedures are followed.[17]  Dentists cannot evade personal liability for malpractice, while non-

---

[10] RX17-1-2.

[11] *Id.*

[12] Haywood Tr. 2472, 2449.

[13] Haywood, Tr. 2449, 2464, 2472-73, 2545, 2567.

[14] *See, e.g.*, Valentine, Tr. 599 (admitting "bleaching can potentially mask pathology").

[15] Haywood, Tr. 2403, 2458-59, 2462, 2473-74, 2530, 2567-68, 2570-71.

[16] *Id.*

[17] Haywood, Tr. 2461-62, 2530, 2570; Wester, Tr. 1290-1291; Owens, Tr. 1451-1452; Hardesty, Tr. 2775-2776; RX63 (Holland, Dep. 145-146); CX392-5.

dentist providers often require that customers sign liability-absolving waivers.[18] N.C.G.S. §55B-9.

Many illegal teeth-whitening kiosks do not have running water.[19] Unlicensed, unsupervised employees at these kiosks are unable to wash their hands, and only can clean equipment with Lysol wipes.[20] Reports indicated that some kiosk employees performed teeth-whitening without gloves or masks.[21] Even spas and salons that have running water do not have to meet the strict sterilization requirements adopted by reference in NCSBDE's rules at 21 NCAC 16J.0103.[22] One NCSBDE investigator reported that the ungloved spa employee who took impressions of her teeth had poison ivy.[23]

There is substantial, uncontroverted evidence that illegal teeth-whitening services can cause damage, necrosis, tearing of mouth and lip flesh, aspirating, and

---

[18] *See*, *e.g.*, CX185-1; Baumer, Tr. 1931; Valentine, Tr. 597, 606-607.

[19] Nelson, Tr. 834; Haywood, Tr. 2403, 2458-59, 2462, 2473-74, 2530, 2567-68, 2570-71; RX11-5-6; RX15-9; RX27-1; RX25-15; RX22-18, 19; RX8-9; Runsick, Tr. 2108-2109; Wester, Tr. 1300-1302, 1321, 1323-24, 1406-07; RX51 (Brown, Dep. 40-41, 43-44); RX63 (Holland, Dep. 84-85, 138-139); Owens, Tr. 1457-1459; Hardesty, Tr. 2782-2785; Valentine, Tr. 531-532, 598-99; Osborn, Tr. 716-719; RX50 (Bakewell, Dep. 318); RX65 (Morgan, Dep. 146); RX75 (Oyster, Dep. 32).

[20] Valentine, Tr. 531-532, 598-99; Osborn, Tr. 716-719; RX50 (Bakewell, Dep. 318); Wester, Tr. 1321, 1323-1324, 1406-1407; Owens, Tr. 1457-1459; RX63 (Holland, Dep. 138-39); RX65 (Morgan, Dep. 146); Hardesty, Tr. 2782-2785; RX75 (Oyster, Dep. 32).

[21] RX50 (Bakewell, Dep. 318).

[22] RX63 (Holland, Dep. 84-85, 138-139); Wester, Tr. 1300-1302; Owens, Tr. 1457-1459; Hardesty, Tr. 2782-2785.

[23] CX284-2; RX58 (Friddle, IH-96).

allergic reactions.[24]  Dangers were described by experts, reported by consumers, and discussed in numerous state and national news stories.[25]

## C.    NCSBDE's Investigations Procedures

NCSBDE annually receives 250-300 unsolicited complaints alleging NCDPA violations.[26]  Teeth-whitening cases comprise only 1-2% of NCSBDE's investigations.[27]  NCSBDE opens investigations upon receipt of public complaints, not of its own volition.[28]  NCSBDE staff number and forward each complaint to the secretary-treasurer, who assigns each case to a case officer ("CO").[29]  The CO is a licensee NCSBDE member whose practice is not in the vicinity of the complaint's subject.[30]  Thus, decisions to authorize cease and

---

[24] Haywood Tr. 2459, 2571-2572; Hardesty, Tr. 2780-2781; Owens, Tr. 1453-1454; RX52 (Burnham, Dep. 114-115); CX392-8.

[25] *See* NCSBDE's Reply on Application for Stay at 12; *see also* RX59 (Goode, IHT 24-26); RX64 (Kurdys, Dep. 57); Giniger, Tr. 461-466; RX82 – RX91; RX94; RX96; RX101; RX103; RX115 – RX117; RX123; RX128 – RX129; RX133.

[26] White, Tr. 2219-2220; RX64 (Kurdys, Dep. 17); RX65 (Morgan, Dep. 288).

[27] Wester, Tr. 1285-1286; Owens, Tr. 1445; Hardesty, Tr. 2771-2772; RX64 (Kurdys, Dep. 37-38).

[28] RX49 (Allen, Dep. 34); RX51 (Brown, Dep. 77-79); RX52 (Burnham, Dep. 171-174); RX57 (Friddle, Dep. 59); RX63 (Holland, Dep. 154-156, 248); RX64 (Kurdys, Dep. 53, 81-82); RX65 (Morgan, Dep. 258-259, 287-288).

[29] Hardesty, Tr. 2765-2766; Owens, Tr. 1440; Wester, Tr. 1281.

[30] Wester, Tr. 1281; Owens, Tr. 1440, 1464; White, Tr. 2202-2203, 2219-2220; Hardesty, Tr. 2765-2766; RX49 (Allen, Dep. 38); RX58 (Friddle, IHT 39); RX65 (Morgan, Dep. 80-83).

desist letters ("C&Ds") were made by a single licensee member serving as CO, who was not in the same geographic market as the recipient.[31]

### D.    Based on *Prima Facie* Evidence of Violations, NCSBDE Sent C&Ds, Which Did Not Stop Lawful Activities.

At the heart of this litigation is FTC's finding that NCSBDE engaged in antitrust violations by sending 47 C&Ds to 29 illegal teeth-whitening providers (two of which were manufacturers).  Opinion-4.  All of these letters were sent based on *prima facie* evidence of a NCDPA violation.

Language substantially the same as the following was contained in **44 of the 47 letters** sent to illegal dental service providers:

> The North Carolina State Board of Dental Examiners **is investigating a report that you are engaged in the unlicensed practice of dentistry.**  Practicing dentistry without a license in North Carolina is a crime.  See (NC General Statutes §90-40 and §90-40.1).
>
> You are hereby ordered to CEASE AND DESIST any and all activity constituting the practice of dentistry or dental hygiene as defined by North Carolina General Statutes §90-29 and §90-233 and the Dental Board Rules promulgated thereunder.
>
> Specifically, G.S. §90-29(b) states that "…[a] person shall be deemed to be practicing dentistry in this State who does, undertakes or attempts to do, or claims the ability to do any one or more of the following acts or things which, for the purpose of this Article, constitute the practice of dentistry:
>
>> "(2)    Removes stains, accretion or deposits from the human teeth;"

---

[31] Trial evidence showed only one exception, which is explained in Statement of Facts, § F, *infra*.

12

"(7)    Takes or makes an impression of the human teeth, gums or jaws;"

"(10)   Performs or engages in any of the clinical practices included in the curricula or recognized dental schools or colleges."

The North Carolina State Board of Dental Examiners is the state agency charged with regulating the practice of dentistry in North Carolina and is the proper agency to conduct this investigation. The Board may use any legal means at its disposal to conduct this investigation including, but not limited to, interviews with current and former patients, surveillance, and the hiring of undercover agents.

The Board **requests that you cooperate in the current investigation by submitting a written response** to this notice within fifteen (15) days of the receipt of this letter.[32]

(emphasis added).  These letters were prepared, signed, and sent by NCSBDE's staff, not by NCSBDE members.[33]  NCSBDE COs did not discuss the merits of sending C&Ds to a particular recipient with other NCSBDE members.

C&Ds informed recipients that NCSBDE was investigating a potential violation.  A few succeeded in stopping crimes, but there is no evidence that the letters stopped **legal** sales.  To the contrary, no illegal teeth-whitening service provider was, or could be, forced to stop operations, unless NCSBDE obtained

---

[32] CX42-1-2, 5-35, 39-40; CX44-4-5; CX50-2-3; CX58-1-2; CX59-1-2; CX68-1-2; CX69-1-2; CX74-1-2; CX77-1-2; CX79-1-2; CX94-5; CX96-1-2; CX97-1-2; CX112-1-2; CX120-1-2; CX122-1-2; CX123-1-2; CX153-1-2; CX155-1-2; CX156-1-2; CX272-1-2; CX279-1-2; CX351-1-2; CX386-1-2; CX387-1-2; CX388-1-2; CX389-1-2; CX390-1-2; CX391-1-2.

[33] Wester, Tr. 1286; Owens, Tr. 1449-1450; White, Tr. 2227; RX57 (Friddle, Dep. 62-63).

13

either a court injunction or the cooperation of a district attorney in a criminal conviction and a court judgment.[34]  C&D recipients had several avenues for relief under North Carolina law.[35]  Each C&D was sent upon receipt of *prima facie* evidence of a NCDPA violation.  Uncontroverted evidence shows that prior to sending each letter, there was at least one indication of illegal activity:  1) eye-witness report[36]; 2) receipt of printed advertising[37]; 3) on-site investigation[38]; 4) investigation via telephone[39]; 5) internet research[40]; or 6) consumer injury or other report.[41]  The letters, even if heavy-handed, only sought to encourage compliance with state law.  **NCSBDE never attempted to prohibit lawful activity**.

### E.    Information to Mall Operators and Cosmetology Board

FTC found that NCSBDE violated antitrust laws by sending eleven letters to mall operators to discourage them from leasing space to illegal dental service

---

[34] Owens, Tr. 1450-1451; Hardesty, Tr. 2774.

[35] White, Tr. 2232-34; Wester, Tr. 1288; RX50 (Bakewell, Dep. 87-88, 214-215); *see, e.g.,* N.C.G.S. §150B-4, 23(a) (declaratory rulings and contested cases).

[36] RX2-1; RX4-1, 5-6, 31-32; RX9-2-3; RX14-2.

[37] RX1-1-3; RX2-1-4; RX4-7, 30, 33; RX6-2, 4-7; RX8-13-14; RX10-1; RX12-1; RX13-1-2; RX14-1, 20; RX16-1-2; RX17-1-3; RX19-1-2; RX21-8-10; RX22-18; RX24-3-5; RX26-11-19; RX27-1, 4, 6-10; RX28-3-4; RX29-1-2; RX30-8; RX31-2; RX32-1, 4-5; CX235-3; CX368-5; CX455-1-2; CX478-3; CX623-3; CX658-5; CX659-3; CX660-3.

[38] RX6-2-3; RX8-6, 10; RX9-2-3; RX19-3; RX21-3; RX22-18-19; RX23-2-3; RX26-1-3; CX478-3; CX623-3.

[39] RX27-1, 4; RX8-1; CX235-3.

[40] RX28-10, 12; RX9-7; RX10-2-3; RX14-4-19; RX16-3-6; RX26-4-10; CX452-1.

[41] RX17-1-2; RX21-4-7; RX21-1 (radio interview with spa operator); RX1-3 & RX23-2 (phone call to spa by complainant).

providers.  Opinion-5.  The information communicated in these letters **was true**.

These letters referenced an enclosed copy of the statute, truthfully stating:

> North Carolina law specifically provides that the removal of stains from human teeth constitutes the practice of dentistry.  See N.C. Gen Stat. [§] 90-29(b)(2), a copy of which is enclosed.  The unauthorized practice of dentistry is a misdemeanor.  See N.C.G.S. [§] 90-40, a copy of which is also enclosed.

> It is our information that the teeth-whitening services offered at these kiosks are not supervised by a licensed North Carolina dentist.  Consequently, this activity is illegal.

> The Dental Board would be most grateful if your company would assist us in ensuring that property owned or managed by your company is not being used for improper activity that could create a risk to the public health and safety.  Please feel free to contact me if you have any questions.[42]

Thus, the letters did not prevent or interfere with lawful business activities.

FTC additionally concluded that NCSBDE "sought to enlist the aid of the cosmetology board in discouraging its licensees from providing teeth-whitening services."  Opinion-5.  Furthermore, FTC concluded that, in February 2007, the N.C. Board of Cosmetic Art Examiners ("Cosmetology Board")—also a state agency—posted on its website a notice prepared by NCSBDE "suggesting that teeth-whitening 'constitutes the practice of dentistry' and that the 'unlicensed practice of dentistry in our state is a misdemeanor.'"  *Id.*  But, again, the truthful statement on the Cosmetology Board's website speaks for itself:

---

[42] CX203-1-2; CX204-1-2; CX260-1-2; CX205-1-2; CX259-1-2; CX260-1-2; CX262-1-2; CX263-1-2; CX323-1-2; CX324-1-2; CX325-1-2.

Cosmetologists should be aware that any device or process that "[r]emoves stains, accretions or deposits from the human teeth" constitutes the practice of dentistry as defined by North Carolina General Statute 90-29(b)(2). Taking impressions for bleaching trays also constitutes the practice of dentistry as defined by North Carolina General Statute 90-29(b)(7).

Only a licensed dentist or dental hygienist acting under the supervision of a licensed dentist may provide these services. The unlicensed practice of dentistry in our state is a misdemeanor.[43]

## F.  Erroneous Findings of Fact Regarding Concerted Action and Financial Interest

FTC concluded that "[a] non-dentist teeth whitener operating within two miles of a dentist could affect the volume of teeth-whitening services provided by the dentist."[44] **Only one of the 47 C&Ds** was authorized by a CO whose practice location met this criterion.[45] The single exception was a C&D (CX123) authorized by Dr. Ronald Owens and sent to a kiosk owner who was represented by a lawyer and who previously received a C&D regarding his Raleigh kiosk.[46] Owens was already the CO for prior complaints regarding the Raleigh kiosk, which was located over 100 miles from Owens' office.[47] Nothing in the record suggests that Owens knew the proximity of the second kiosk when he authorized the letter, or

---

[43] CX67-3, text of Cosmetology Board website posting.

[44] Initial Decision Finding ("IDF") 160 (citing CX565-24 (Hardesty, Dep. 87)).

[45] RX28-1-2; RX29-1; CX38-4; CX44-5; CX128-1; CX247-1; CX249-1; CX270-1-2; CX283-1; CX347-1; CX348-1; CX353-1; CX361-1; CX462-3-4.

[46] *See* RX4-1; CX68-1-2; CX257-1.

[47] CX462-3. Assigning the same CO to all complaints related to the same owner was a common practice of NCSBDE. *See, e.g.,* RX65 (Morgan, Dep. 80-81).

16

that he regarded the kiosk as a competitor. Further, the letter had no effect. The recipient never responded and did not change his mode of business.[48] FTC never offered the recipient as a witness.

FTC also claims that "[m]embers of the Board likewise recognized that proliferation of non-dentist teeth-whitening operations would adversely affect the income of dentists." Opinion-20. To support this claim, FTC relies upon an out-of-context portion of Dr. Joseph Burnham's deposition, in which he testified that NCSBDE discussed the possibility that consumers might go to a kiosk instead of a dentist for teeth-whitening services.[49] However, Dr. Burnham denied that NCSBDE ever discussed the price of non-dentist teeth-whitening services.[50] He expressed concern over the public health risk for someone who whitened their teeth at a kiosk instead of a dentist's office.[51] Such a cherry-picking expedition reveals the extent to which FTC's Opinion and the facts on which it rests are flawed and unsubstantiated.

## SUMMARY OF ARGUMENT

FTC erroneously sought to make an antitrust case out of a *bona fide* state agency's enforcement of clearly-articulated state public protection statutes. FTC

---

[48] CX462-4.
[49] CX556 (Burnham, Dep. 152).
[50] CX556 (Burnham, Dep. 151).
[51] CX556 (Burnham, Dep. 153).

was required to prove that: 1) it had jurisdiction under FTCA; 2) NCSBDE was not entitled to state action immunity; 3) NCSBDE was capable of conspiring with itself; 4) NCSBDE did, in fact, conspire with itself; 5) NCSBDE unreasonably restrained trade in the relevant market; 6) NCSBDE was not justified in its enforcement of statutes to protect the public; and 7) its proposed remedy would not violate N.C. law or the U.S. Constitution. FTC has not shown any of the requisite elements.

FTC has pieced together a novel theory of antitrust liability that fails at every turn. State agencies acting pursuant to clearly-articulated statutes are always entitled to immunity. There was no conspiracy. The relevant market should not include illegal operators. Almost everyone except FTC understands that teeth-whitening is the removal of stains from teeth. Communications to illegal operators, malls, and the Cosmetology Board's website were truthful efforts to encourage compliance with a clearly-articulated statute. The efforts to enforce state statutes by state agencies never have been and should not be subjected to a truncated or traditional rule of reason analysis, much less a stealth *per se* standard. Public protection is ample justification for good-faith enforcement by a state agency of a clearly-articulated state statute.

Efforts to stop illegal practice of dentistry are not violations of federal antitrust law. It is the constitutionally-protected prerogative of states to establish

18

state agencies comprised of experts who are required by law and oath to act only in the public interest. Even if taken as true, the Complaint should not have been filed. With the evidence in hand, FTC's Opinion borne of its demonstrably false Complaint should be reversed and its Final Order vacated.

## ARGUMENT

## I.    STANDARD OF REVIEW

### A.    FTC Erred in Denying NCSBDE's Motion to Dismiss.

FTC erred in denying NCSBDE's Motion to Dismiss during the administrative proceeding. The Complaint should have been dismissed because it consisted only of "labels and conclusions" without sufficient factual allegations to support the elements of the cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (factual allegations only deemed sufficient under a "plausibility" standard when the allegations amount to "more than a sheer possibility that a defendant acted unlawfully").

CC alleged, without more, that the "conduct of [NCSBDE] constitutes concerted action by its members and the dentists of North Carolina." Complaint-2. Furthermore, CC made no allegations that tended to exclude the possibility that NCSBDE members acted independently and pursuant to a clearly-articulated statute. The Complaint falls far short of the pleadings standard set forth in

19

*Twombly* and *Ashcroft*. Had the proper standard for review been applied, CC's Complaint would have been dismissed as a matter of law. *See FTC v. Swish Mktg.*, No. C09-03814, 2010 U.S. Dist. LEXIS 15016, **10-12 (N.D. Cal. Feb. 22, 2010) (unpublished); *cf. FTC v. Klesner*, 280 U.S. 19, 29 (1929) ("the Commission's action in authorizing the filing of a complaint, like its action in making an order thereon, is subject to judicial review.").

## B. FTC Erred in Granting CC's Motion for Partial Summary Decision.

As discussed *infra*, FTC erred when granting CC's Motion for Partial Summary Decision ("MPSD") on the issue of state action immunity. Furthermore, FTC erred by using the conclusions drawn in the MPSD Order to foreclose NCSBDE's ability to present evidence at trial on other issues of law. It is well-established that FTC "cannot try issues of fact on a motion for summary decision but can only determine whether there are issues to be tried." *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1360 (11th Cir. 1988).

## C. FTC's Holding on State Action Immunity Is Not Entitled to Deference.

FTC's opinion denying state action immunity is not entitled to deference. As the First Circuit has recognized:

> We do not agree with the FTC that the question of state action is one on which this court should defer to that agency, either because of its expertise or its statutory fact-finding authority. . . . The FTC is not here interpreting the statute it has been charged with administering

20

> (i.e., the Federal Trade Commission Act) but instead is resolving a
> judicially-created principle of immunity that, if applicable, bars the
> FTC's jurisdiction. The underlying facts, consisting of state statutes
> and the stipulations accepted by the ALJ, are not in dispute. How
> these facts meld into the state action concept—the issue now before
> us—is a legal issue which the courts have plenary authority to decide.

*New England Motor Rate Bureau, Inc. v. FTC*, 908 F.2d 1064, 1072 (1st Cir. 1990)

(internal citations omitted).

State action is a common law doctrine arising from Tenth Amendment principles. As such, FTC's ruling on state action immunity rests upon constitutional conclusions of law, which must be reviewed *de novo* by this Court. *Spiegel, Inc. v. FTC*, 540 F.2d 287, 294 (7th Cir. 1976) ("Generally, federal administrative agencies are without power or expertise to pass upon the constitutionality of administrative or legislative action"); *Soadjede v. Ashcroft*, 324 F.3d 830, 831 (5th Cir. 2003) (recognizing that challenges to an administrative agency's constitutional conclusions of law are reviewed *de novo*).

### D.    FTC's Opinion and Final Order Are Not Entitled to Deference.

Generally, in a petition for review of an FTC order, "[t]he findings of the [FTC] as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C. §45(c); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986). However, "it still remains the duty of the supervising court to determine whether the facts found are such as to warrant the [FTC's] conclusion." *Temple Anthracite Coal Co. v. FTC*, 51 F.2d 656, 659 (3d Cir. 1931). If the reviewing court identifies any findings that

are not supported by substantial evidence, are arbitrary or capricious, or proceed from an error of law, they cannot be upheld. *Benrus Watch Co. v. FTC*, 352 F.2d 313, 317 (8th Cir. 1965).

A court must apply the "whole record" test when determining if such substantial evidence exists. 5 U.S.C. §706; *FTC v. Curtis Publ'g Co.*, 260 U.S. 568, 580 (1923) ("court must inquire whether [FTC's] findings of fact are supported by evidence" and "examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the Commission"). The court should view the record in its entirety when applying this standard, including unfavorable evidence that FTC ignored in its final decision. *Preferred Sites LLC v. Troup County*, 296 F.3d 1210, 1218 (11th Cir. 2002) (citing *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)). In addition, where the Commission makes findings contradicting those of the ALJ, "a reviewing court will review more critically the [agency's] findings of fact." *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977); *Thiret v. FTC*, 512 F.2d 176, 179 (10th Cir. 1975); *Am. Cyanamid Co. v. FTC*, 363 F.2d 757, 772-73 (6th Cir. 1966).

Of course, such deference does not apply to FTC's conclusions of law. *Toys R Us, Inc. v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000) (noting that it reviews FTC's legal conclusions *de novo*).

22

## II.    FTC LACKS JURISDICTION OVER NCSBDE.

Throughout this case,[52] NCSBDE has consistently raised the issue that FTC does not have jurisdiction over NCSBDE.  Under FTCA, Congress did not express an intention to extend the FTC's jurisdiction over state agencies.  FTCA only grants the FTC authority over "persons, partnerships, or corporations."  15 U.S.C. §45(a).  NCSBDE is an agency of the sovereign state of N.C., not a person, partnership, or corporation.  *See Parker v. Brown*, 317 U.S. 341, 350-51 (1943); *Calif. State Bd. of Optometry v. FTC*, 910 F.2d 976, 981 (D.C. Cir. 1970). Therefore, the FTC lacks jurisdiction under its own narrow enabling statute.

FTC's extra-congressional effort to extend its jurisdiction without legislative approval violates the fundamental principle of separation of powers and the Tenth Amendment to the U.S. Constitution.  *See New York v. United States*, 505 U.S. 144, 161 (1992) (invalidating a federal law provision because not even Congress can "simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program") and *Printz v. United States*, 521 U.S. 898, 929 (1997) (requiring state officers "to perform discrete, ministerial tasks specified by Congress" violates the federalism principles under the Tenth Amendment).

---

[52] And as briefed more fully in NCSBDE's independent suit against FTC and NCSBDE's briefs before FTC.

## III.   NCSBDE IS ENTITLED TO STATE ACTION IMMUNTY.

Before addressing the merits of FTC's Opinion, the first and fundamental issue to be decided is whether FTC erred in granting CC's MPSD, when it held that NCSBDE was not entitled to state action immunity.  *New England Motor Rate Bureau*, 908 F.2d at 1072 ("state action immunity is a threshold issue that must be decided before the FTC's own jurisdiction attaches . . . the FTC's authoritative role commences only after it has been decided that the challenged activities are not immune").

The principal of state action immunity—that federal antitrust laws do not apply to states' sovereign acts—was first set forth by *Parker v. Brown*:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

317 U.S. 341, 350-51 (1943).

Since *Parker,* every court that addressed state action immunity has held that state agencies acting pursuant to clearly-articulated state laws are not subject to FTCA.  There are no caveats or exceptions.  Applying this precedent to the present

24

case, FTC clearly erred[53] in granting CC's MPSD because: (1) NCSBDE qualifies for state action immunity because it acted pursuant to a clearly-articulated state law; (2) NCSBDE is not required to show active supervision; and (3) while not required, such active supervision exists.

### A.    NCSBDE's Challenged Actions Enforced a Clearly-Articulated State Law.

NCSBDE is entitled to immunity because its challenged actions were pursuant to a clearly-articulated and affirmatively expressed state law. *Calif. State Bd. of Optometry v. FTC*, 910 F.2d 976, 981 (D.C. Cir. 1970) (It is "clear, under the 'state action' doctrine enunciated in *Parker v. Brown*, that when a State acts in a sovereign rather than a proprietary capacity, it is exempt from the antitrust laws even though those actions may restrain trade"); *Nassimos v. Bd of Exam'rs of Master Plumbers*, No. 94-1319, 1995 U.S. Dist. LEXIS 21376, at **10-11 (D.N.J. Mar. 31, 1995), *aff'd*, 74 F.3d 1227 (3d Cir. 1995), *cert. denied*, 517 U.S. 1244 (1966) ("Where an entity is designated to serve as the state's administrative

---

[53] In its MSPD Opinion FTC held that, to establish state action immunity, NCSBDE must show that it acted pursuant to a clearly-articulated state law and must show active supervision. MPSD Opinion-7. Assuming that NCSBDE acted pursuant to a clearly-articulated law, FTC concluded that NCSBDE could not show active supervision. FTC's holding is incorrect, as NCSBDE only must show that it acted pursuant to a clearly-articulated law. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46 n.10 (1985). In contrast, private associations seeking state action immunity must show active supervision. *See Calif. Retail Liquor Dealers Ass'n v. Midcal*, 445 U.S. 97, 109 (1980) (liquor distributor); *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) (voluntary bar association); *Asheville Tobacco Bd. of Trade v. FTC*, 263 F.2d 502 (4th Cir. 1959) (consortium of tobacco buyers).

adjunct for purposes of regulating a licensed profession, the entity is considered a state agency for purposes of the 'state-action exemption' to the federal antitrust laws.") (citing *Brazil v. Ark. Bd. of Dental Exam'rs*, 593 F. Supp. 1354, 1362-63 (E.D. Ark. 1984), *aff'd*, 759 F.2d 674 (8th Cir. 1985)).

### 1.    NCSBDE Enforced a State Law—Not a Rule, and Not an Internal Policy.

FTC's Opinion granting CC's MPSD did not recognize that NCSBDE's actions were taken to enforce a state law.  FTC based its decision on the erroneous conclusion that NCSBDE "**determined on its own** that teeth-whitening was a practice that could be performed only under the supervision of a dentist" and "**exercised discretion to implement a policy** to exclude non-dentists from a market in which they compete against North Carolina dentists."  MPSD Opinion-2, 12 (emphasis added).  This fundamental flaw ignores NCDPA's clear language categorizing stain removal as the practice of dentistry and authoring NCSBDE to enforce this statute.  N.C.G.S. §90-29(b)(2).

### 2.    NCDPA Is Clearly-Articulated, Regardless of Whether It Expressly Authorizes the Challenged Actions.

The Supreme Court has held that statutes clearly authorize immune conduct when such conduct is the "foreseeable result" of the statute.  *City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 372-73 (1991).  NCSBDE's enforcement of N.C.G.S. §90-29(b)(2) was the foreseeable result of the state law.  Thus, express

26

authorization for NCSBDE's conduct is not necessary, nor is it realistic. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46 (1985) ("Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness."); *see also Porter Testing Lab. v. Bd. of Regents for Okla. Agric. & Mech. Colleges*, 993 F.2d 768, 771 (10th Cir. 1993) ("a successful *Parker* defense does not depend on a state's ability 'to point to a specific, detailed legislative authorization'") (internal citation omitted). The clear articulation standard "require[s] only that the anticompetitive conduct be reasonably anticipated." *FTC v. Phoebe Putney Health Sys.*, 663 F.3d 1369, 1375-76 (11th Cir. 2011) (internal citations omitted); *FTC v. Hosp. Bd. of Dirs.*, 38 F.3d 1184, 1188 (11th Cir. 1994) (A "foreseeable anticompetitive effect" need not be "one that ordinarily occurs, routinely occurs, or is inherently likely to occur as a result of the empowering legislation"). Here, NCDPA creates a reasonably anticipated and foreseeable result of displacing competition by clearly articulating a policy to displace competition.

This Court has found clear articulation in cases where there was a far more general grant of authority than the present case. *See, e.g., Cohn v. Bond*, 953 F.2d 154, 158 (4th Cir. 1991) ("North Carolina statutes authorizing municipalities to construct, operate and maintain hospitals . . . contemplate anticompetitive effects") (quoting *Coastal Neuro-Psych v. Onslow Mem'l*, 795 F.2d 340 (4th Cir. 1986)). In

27

contrast, the expected and predictable result of a state law limiting the practice of dentistry to licensed persons is that such limitations will be enforced.  This is true, regardless of any anticompetitive effect on unlicensed conduct.

### 3.    NCDPA Prohibits Unlicensed Persons from Providing Teeth-Whitening Services.

Substantial evidence before FTC shows that teeth-whitening is stain removal.  However, FTC declined to decide whether teeth-whitening constitutes stain removal.  Opinion-37.  But, that finding is critical to determine whether NCSBDE is entitled to state action immunity.

First, at trial, the evidence showed that members of the teeth-whitening industry advertise their services with claims that it will remove stains from teeth.[54] Second, NCDPA is required to be "liberally construed to carry out [its] objects and purposes," such that the meaning of "stain removal" should not be narrowly read. N.C.G.S. §90-22(a).  Third, in civil cases brought by NCSBDE, the position that teeth-whitening and stain removal are synonymous has remained unscathed.[55]

---

[54] RX19-7; RX26-4, 9, 13; RX30-5, 8; RX32-5.

[55] *See* RX8-15-17 & RX25-25-27, consent orders in *N.C. State Bd. of Dental Exam'rs v. Carmel Day Spa & Salon*, No. 08CVS1542 (Mecklenburg County Super. Ct. July 9, 2008) and *N.C. State Bd. of Dental Exam'rs v. Signature Spas of Hickory, Inc.,* No. 06CVS3843 (Catawba County Super. Ct. Oct. 31, 2008), wherein the non-licensee defendants were enjoined from "engaging in any act or practice constituting the practice of dentistry either in person or through their agents, employees or independent contractors, including, but not limited to, engaging in the removal of stains, accretions or deposits from human teeth and

Fourth, other states and countries consistently recognize that teeth-whitening is the unauthorized practice of dentistry.[56]

NCDPA limits the ability of unlicensed individuals to compete with dentists in the provision of teeth-whitening services because teeth-whitening constitutes stain removal. Thus, NCDPA vests NCSBDE with the power to "regulate with a certain kind of anticompetitive result." Areeda, *Antitrust Law* ¶ 212.3b (Supp. 1982). "Such results, even if erroneous in the particular case [unlike the present case], are contemplated by anticompetitive state policy . . . and should therefore be deemed immune state action . . . ." *Id.* Areeda declared that "[o]rdinary errors or abuses in the administration of jurisdiction conferred by the state should be left for state tribunals to review." *Id.* Thus, even assuming *arguendo* that NCSBDE was not authorized to send C&Ds to illegal dental service providers, an antitrust tribunal is not the appropriate authority to review such conduct.

> To be sure, state law "authorizes" only agency decisions that are substantively and procedurally correct. Errors of fact, law, or judgment by the agency are not "authorized." Erroneous acts or decisions are subject to reversal by superior [state] tribunals because unauthorized. If the antitrust court demands unqualified "authority" in this sense, it inevitably becomes the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law. We should not lightly assume . . .

---

representing to the public that it or they can engage in the removal of stains, accretions or deposits from human teeth."
[56] *See* Memorandum in Support of Motion to Dismiss at 27-28.

> [a] transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend upon an undiscriminating and mechanical demand for "authority" in the full administrative law sense. . . . **If an allegation of agency error or other unauthorized action is enough to deny antitrust immunity for public agencies, virtually every zoning decision, franchise grant, utility tariff ruling, or other routine governmental act will be subject to antitrust scrutiny. . . . Wise and efficient federalism calls for no such result.**

*Id.* at 56-7 (emphasis added). State agencies must be permitted to fulfill their statutory mandates without being subject to undue federal antitrust scrutiny. It is the common practice of states to direct their agencies to respond to allegations of unauthorized practice with C&Ds.[57] This practice has long been protected under federal law.

### B.    NCSBDE Is Not Required to Demonstrate Active Supervision to Qualify for State Action Immunity.

FTC held that, to establish state action immunity, NCSBDE must show that it acted pursuant to a clearly-articulated state law **and** that its actions were actively supervised by the state. MSPD Opinion-13. FTC concluded that NCSBDE could not establish active supervision. *Id.* at 17.

FTC's holding is contrary to the decisions reached by all of the federal appellate courts to consider this issue since *Parker v. Brown.* Furthermore, it is contrary to the *in dicta* statement of the Supreme Court in *Town of Hallie,* 471 U.S.

---

[57] White, Tr. 2226-2227; *see also* RX37-2; RX38; RX39; RX34-3; RX35-3; RX36-5.

at 46 n.10 ("In cases in which the actor is a state agency, it is likely that active state supervision would also not be required").  Courts have repeatedly addressed the question of whether a state agency, acting pursuant to state law, must show that its actions were actively supervised by the state.  Immunity has been granted in every case involving state agencies acting pursuant to state law.

### 1. State Boards Acting Pursuant to State Law Always Are Granted Immunity; Cases Cited by FTC Are Distinguishable.

This Court may be guided by consideration of several key decisions addressing the issue of an active supervision requirement.  In *Earles v. State Board of Certified Public Accountants of Louisiana*, the Fifth Circuit held that the Louisiana licensing board was exempted from the active-supervision prong."  139 F.3d 1033, 1041 (5th Cir. 1998).  This was true, "[d]espite the fact that the State Board is composed entirely of CPAs who compete in the profession they regulate" because "the public nature of the State Board's actions means that there is little danger of a cozy arrangement to restrict competition."  *Id.* at 1041.

In *Brazil v. Arkansas Board of Dental Examiners*, the Eighth Circuit affirmed that the Arkansas board was not required to show active state supervision to qualify for state action doctrine immunity since it was not a private actor.  593 F. Supp. 1354, 1362 (E.D. Ark. 1984), *aff'd*, 759 F.2d 674 (8th Cir. 1985).  The court held that active supervision "has no application in the context of traditional

31

anticompetitive acts attributed to agencies and municipalities." *Id.* at 1362 (internal citations omitted).

In *Hass v. Oregon State Bar*, the Ninth Circuit tackled head-on the question of what characteristics determine the applicability of the active supervision requirement. 883 F.2d 1453 (9th Cir. 1989). As in *Brazil*, the requirement hinged on whether the Oregon Bar was a private actor or a state actor. The court found "that the Bar, as an agency of the State of Oregon, need not satisfy the "active supervision" requirement to qualify for protection under the state action exemption" because:

> The records of the Bar, like those of other state agencies and municipalities, are open for public inspection. The Bar's accounts and financial affairs, like those of all state agencies, are subject to periodic audits by the State Auditor. The Board, like the governing body of other state agencies and municipalities, is required to give public notice of its meetings, and such meetings are open to the public. Members of the Board are public officials who must comply with the Code of Ethics enacted by the state legislature to guide the conduct of all public officials. These requirements leave no doubt that the Bar is a public body, akin to a municipality for the purposes of the state action exemption.

*Id.* at 1460-61 (internal citations omitted).

Similarly, in *Bankers Insurance Co. v. Florida Residential Property & Casualty Joint Underwriting Ass'n*, the Eleventh Circuit found that a state insurance agency was entitled to state action immunity without a showing of active supervision, after considering its structure:

32

> Factors favoring political-subdivision treatment include open records, tax exemption, exercise of governmental functions, lack of possibility of private profit, and the composition of the entity's decisionmaking structure. . . . The more public the entity looks, the less we worry that it represents purely private competitive interests, and the less need there is for active state supervision to ensure that the entity's anticompetitive actions are indeed state actions and not those of an alliance of interests that properly should be competing.

137 F.3d 1293, 1296-97 (11th Cir. 1998) (internal citations omitted).

NCSBDE passes the *Hass* and *Bankers Insurance* tests easily. NCSBDE's funds are public funds, and are subject to the oversight of the State Auditor. N.C.G.S. §93B-6. NCSBDE's meetings, including those in which enforcement actions may be discussed, are subject to statutes governing the conduct of state government. N.C.G.S. §143-318.9 *et seq*.; N.C.G.S. Chapter 132. NCSBDE members are sworn to uphold NCDPA, and to comply with the state and federal constitutions. N.C. CONST. art. VI, §7. NCSBDE is exempt from the application of federal and state taxes, and cannot earn a private profit. For these reasons, NCSBDE, like the state bar in *Hass* and the underwriting association in *Bankers Insurance*, is entitled to state action immunity based on a showing that it acted pursuant to a clearly-articulated state law without any discussion of active supervision.

FTC claims that the courts in *Earles*, *Hass*, and *Bankers Insurance* focused on the "attributes of the respective governmental entities . . . to determine the extent to which they resembled the municipality in *Hallie*" rather than "whether

33

the challenged restraint was effected by a body controlled by market participants."
Opinion-11. But, the state agencies in *Hass* and *Earles* were comprised of a
majority of licensees, as is the situation here. *Earles*, 139 F.3d at 1041; *Hass*, 883
F.2d at 1468. Further, state action immunity is not granted based on whether a
state constructs its agencies to be majority licensee. Immunity is predicated on the
fact that the state is acting as a sovereign. *Calif. State Bd of Optometry*, 910 F.2d
at 981. North Carolina's Legislature, acting as a sovereign, determined that
NCSBDE would be comprised of a majority of licensees. Congress did not grant
FTC the power to change this law.

Numerous other federal cases grant immunity to state agencies acting
pursuant to state law. *See, e.g.*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 359-60
(1977); *Neo Gen Screening Inc. v. New England Newborn Screening Program*, 187
F.3d 24, 28-29 (1st Cir. 1999); *Automated Salvage Transp., Inc. v. Wheelabrator
Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d Cir. 1998); *Nassimos*, 1995 U.S. Dist. LEXIS
21376, at *10; *Saenz v. Univ. Interscholastic League*, 487 F.2d 1026, 1028 (5th
Cir. 1973); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d
869, 876 (9th Cir. 1987); *Deak-Perera Haw., Inc. v. Dep't of Transp.*, 745 F.2d
1281, 1283 (9th Cir. 1984). FTC ignores this body of case law and, instead, relies
on a handful of cases that are easily distinguishable from the case at bar. MPSD
Opinion 9-10.

### a. FTC Relies on Cases Where a State Agency Acted Pursuant to an Internal Rule or a Private Association Policy, Not a State Law.

FTC's claim that NCSBDE is not immune is largely based on the pre-*Midcal* and pre-*Hallie* decision of *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975). There, the Virginia State Bar enforced a fee schedule developed by a private bar association. One striking difference between *Goldfarb* and the instant case explains this denial: the state bar in *Goldfarb* did not act independently to enforce a clearly-articulated state law. **No state statute** authorized the Virginia Bar's conduct. Therefore, in contrast to the present case, private parties - **not a state law -** produced the policy at issue. *Id*. at 790-91 (defendants could cite "no Virginia statute requiring their activities; state law simply does not refer to fees . . . although the Supreme Court's ethical codes mention advisory fee schedules, they do not direct either respondent to supply them, or require the type of price floor which arose from respondents' activities").

Another case upon which FTC relied, *FTC v. Monahan*, again involved a licensing board acting pursuant to its own internal rule. 832 F.2d 688, 689-90 (1st Cir. 1987). The First Circuit concluded that an examination was necessary to determine whether the rule was enacted in accordance with a clearly-articulated law. *Id.* at 689 ("We can find no 'clearly articulated and affirmatively expressed' state policy that guarantees the Board its protection"); *see also Mass. Bd. of*

*Registration in Optometry*, 110 F.T.C. 549, 1988 FTC LEXIS 34, at *36 (1988) (There was no statutory "mandate or authorization" for the Board's rules on advertising; active supervision was not even discussed in the case, "as complaint counsel and FTC agree that the Commonwealth need not demonstrate active supervision to establish state action immunity in this case").

  **b. FTC Relies on Cases Where Active Supervision of a Private Association, Not a State Agency, Is at Issue.**

  In support of its finding that NCSBDE must be subject to active supervision, FTC relied on several federal cases—including one from the Fourth Circuit—where courts considered whether a private association, not a state agency, was subject to both prongs of the *Midcal* test. MPSD Opinion-9. FTC likewise cites cases analogizing NCSBDE's actions to that of private, entirely non-governmental, associations acting pursuant to internal policies rather than state laws. Opinion-21 & 23. Just as state agencies acting without authorization of a clearly-articulated law do not provide useful guidance in this case, the same is true for non-governmental organizations acting without authorization or supervision.

  For instance, in *Washington State Electrical Contractors Ass'n v. Forrest*, the Ninth Circuit found that immunity did not exist because the respondent "may not qualify as a state agency." 930 F.2d 736, 737 (9th Cir. 1991). The apprenticeship council in *Forrest* was comprised of public and private members, and the private members had "their own agenda which may not be responsive to

36

state labor policy." *Id.* Unlike the apprenticeship council, NCSBDE is comprised of all sworn state officials, without any private members, and NCSBDE members are required to act in the public interest, enforcing state policy expressed via clear state statutes.

In another pre-*Midcal* case cited by FTC, *Asheville Tobacco Board of Trade v. FTC*, this Court examined a list of factors to determine that the Tobacco Board of Trade was not a state actor, and not immune. 263 F.2d 502 (4th Cir. 1959). The Tobacco Board was deemed "organized primarily for the benefit of those engaged in the business; its articles of association and bylaws constitute a contract amongst the members by which each member consents to reasonable regulations pertaining to the conduct of the business." *Id.* at 509. The officers and directors of the Tobacco Board were not even "accountable to the State." *Id.* at 510. The Tobacco Board was not required to comply "with a North Carolina statute which directs each State agency to file with the Secretary of State all rules and regulations adopted by the agency for the performance of its functions." *Id.* The Tobacco Board differs from NCSBDE in all of these characteristics, for the reasons set forth in the Statement of Facts, *supra*.

FTC also relies on *Norman's on the Waterfront, Inc. v. Wheatley*, where the Third Circuit determined that a Virgin Islands law exceeded "the authority granted to the Virgin Islands legislature by Congress." 444 F.2d 1011, 1016 (3d Cir.

37

1971). But, the Virgin Islands had not granted the board in *Norman's* the "power to approve, disapprove, or modify the prices fixed by private persons" as was at issue in that case. *Id* at 1018. Further, the Third Circuit indicated that the Virgin Islands board itself could have actively supervised private parties.

FTC explains its reliance on the above-listed cases with the assertion that "the courts of appeals have been less than consistent" on the question of immunity for state agencies. MPSD Opinion-9; Stay Order-2. This is incorrect. Without any exceptions, courts grant state action immunity to state agencies acting pursuant to state law.

### 2. If Active Supervision Were Required to Establish State Action Immunity, Such Supervision Existed.

As discussed *supra*, courts have generally held that state agencies acting pursuant to state law need not demonstrate active supervision. Therefore, there is little federal case law examining what active supervision would entail for a state agency. As discussed *supra*, **courts even allow state agencies themselves to actively supervise the decisions of private individuals.** *See Flav-O-Rich, Inc. v. N.C. Milk Comm'n*, 593 F. Supp. 13, 18 (E.D.N.C. 1983) (although FTC was a state agency, it demonstrated active supervision of decisions made in cooperation with private individuals by following state law requirements to hold "regular meetings" and monitor private producers' "flow of price and cost information");

*see also Ky. Household Goods Carrier Ass'n*, 139 F.T.C. 404 (2005) (judging whether a state agency provided adequate supervision to a private association).

Other courts have concluded that state agencies can meet the active supervision requirement simply by satisfying the "clearly articulated state statute" prong. For example, in *Gambrel v. Kentucky Board of Dentistry*, the court found that the Kentucky Board and private dentists acted pursuant to a state law concerning the unauthorized practice of dentistry. 689 F.2d 619 (6th Cir. 1982). The Sixth Circuit found that there was "no dispute" over the question that the state "actively supervises" the limitation on unauthorized practice, as

> the policy [at issue] emanates directly from the language of a state statute and not from any agreements by private individuals as in *Midcal*. Secondly, the powers of enforcement are expressly conferred upon the Board of Dentistry, and it appears that historically the Board has indeed acted to uphold and enforce the regulatory scheme.

*Id.* at 620. The active supervision requirement is met when a state agency acts pursuant to state law, within the powers legislatively granted to it.

### 3. FTC's Attempt to Assert Itself as the "Active Supervisor" over a State and Its Agencies Is Neither Warranted Nor Legal.

FTC's Final Order purports to provide, via this case, active supervision over a *bona fide* state agency in order to remedy NCSBDE's supposed lack of active supervision. The Final Order would assert FTC as a supervisory body over

NCSBDE, with the power to interpret state law, compel actions by state officials, require the expenditure of state funds, and require actions that violate state law.

The Final Order itself contradicts state law and constitutional principles of federalism. For example, it bars NCSBDE from informing potential respondents that unlicensed teeth-whitening services are prohibited under state law. Order-3. No such limitations are imposed on NCSBDE's enforcement of any other unauthorized practice provisions in NCDPA. The Final Order further mandates that NCSBDE expend funds to comply with the Final Order, including permitting FTC to enter its premises and inspect its books and records and requiring it to pay for copies of documents for FTC. Order-4-6.

FTC is attempting to actively supervise NCSBDE, much as a state agency might oversee the conduct of a private party. But, "[w]ise and efficient federalism calls for no such result." Areeda, *Antitrust Law* ¶ 212.3b (Supp. 1982); *see also Calif. State Bd. of Optometry*, 910 F.2d at 982 (noting that California's regulation of the practice of optometry is "quintessentially sovereign" and declaring that "[a]n agency may not exercise authority over States as sovereigns unless that authority has been unambiguously granted to it" because doing so "would alter the usual balance between the Federal Government and the States"). Neither FTCA nor any other federal law:  1) mandate that state agencies acting pursuant to clearly-articulated state law demonstrate active state supervision; 2) contemplate requiring

state agencies to undergo active supervision by FTC; or 3) authorize FTC supervision.

In conclusion, the legislative history of federal antitrust laws and all federal case law on point reach the same conclusion: NCSBDE, as state agency acting pursuant to a clearly-articulated state law, is entitled to state action immunity. No showing of active supervision is required, and rarely is the issue even discussed in federal case law concerning state agencies. Even if NCSBDE's conduct was examined for some evidence of active supervision, it would pass this test as well. Therefore, NCSBDE's enforcement of NCDPA against illegal teeth-whitening service providers is immune from the application of FTCA.

## IV.    NCSBDE DID NOT AND COULD NOT ENGAGE IN CONCERTED ACTION.

Even without state action immunity, NCSBDE did not engage in a contract, combination, or conspiracy in restraint of trade or commerce. As explained above, NCSBDE is not a corporate entity, either public or private, nor an unincorporated trade association. It is a state agency established solely for public protection. Statutes prohibit it from providing services to licensees and competing in any business. Licensee board members, though required by statute to be practitioners, are required to leave their private interests at the door. NCSBDE did not and could not conspire.

41

FTCA §5 requires proof that NCSBDE engaged in some form of unlawful "concerted action" to restrain trade in the relevant market. Evidence must show that NCSBDE was **capable** of engaging in "a contract, combination, . . . or conspiracy" embodying concerted action and that NCSBDE should not be "viewed as . . . a single enterprise for purposes of §1." *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2209 (2010) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)) (holding that "an arrangement must embody concerted action in order to be a 'contract, combination . . . or conspiracy' under [Sherman Act §1]"). A determination as to whether NCSBDE was capable of engaging in an unlawful contract, combination, or conspiracy must be made within the context of challenged action—excluding illegal dental service providers from the market. *See Am. Needle*, 130 S. Ct. at 2214.

Second, substantial evidence must show that NCSBDE **actually** engaged in "a contract, combination . . . or conspiracy" that embodied concerted action. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991) ("To conclude that [defendants] have the capacity to conspire among themselves does not mean, however, that every action taken by the staff satisfies the contract, combination, or conspiracy requirement of section one"). Thus, to show the existence of actual unlawful concerted action, CC was required to "discharge a twofold evidentiary burden" by: (1) establishing that NCSBDE "had a conscious commitment to a

42

common scheme designed to achieve an unlawful objective"; and (2) presenting "evidence that excludes the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 543 (4th Cir. 1991) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

The evidence did not show that NCSBDE was capable of engaging in unlawful concerted action. Furthermore, assuming *arguendo* that such capabilities were proven at trial, the record lacks evidence of illegal concerted action.

### A.    NCSBDE Is Not Capable of Engaging in Concerted Action.

The Supreme Court recently articulated that the key to determining whether an entity is capable of engaging in concerted action is whether there exists:

> [a] contract, combination . . . or conspiracy amongst separate economic actors pursuing separate economic interests, . . . such that the agreement deprives the marketplace of independent centers of decisionmaking, . . . and therefore of diversity of entrepreneurial interests, . . . and thus of actual or potential competition.

*Am. Needle,* 130 S. Ct. at 2212-13. In making that determination, courts must engage in a "functional analysis" by considering how the parties involved actually operate and not by judging the parties "on the label of their hats." *Id*. at 2209-10.

FTC concluded that NCSBDE members "were capable of conspiring because they are actual or potential competitors." Opinion-14. Ironically, FTC reaches this conclusion by "labeling" NCSBDE members as dentists, and ignoring

43

the reality of how NCSBDE operates.  NCSBDE members are required to comply

with a number of statutory safeguards to remove any potential financial interests

that they may have in serving on NCSBDE:

- NCSBDE members are banned from having conflicts of interest that would compromise this oath and are required to take mandatory ethics courses and file regular financial disclosures to prevent such conflicts of interest. N.C.G.S. §§138A-14(b), 93B-5(g), 138A-21 through 138A-27.

- NCSBDE members must recuse themselves where there is a potential conflict of interest, and members who testified during the administrative proceeding indicated that they had done so.[58]  N.C.G.S. §138A-39(a).

- NCSBDE members may face criminal penalties and removal from NCSBDE if they "willfully omit, neglect, or refuse to discharge any of the duties of [their] office."  N.C.G.S. §§14-230, 138A-31, 138A-34, 138A-45(g).

- NCSBDE's only statutory purpose is to regulate the practice of dentistry "in the public interest," and its engagement in any other activity would contravene its duly-delegated legislative authority.  N.C.G.S. §90-22(a).

- The N.C. Constitution prohibits NCSBDE from committing antitrust violations.  N.C. CONST. art I, §34.

State statutes which divest board members of potential financial interests

must be considered to determine whether NCSBDE is capable of concerted action,

so that the analysis truly examines how NCSBDE actually operates.  When these

state laws are considered, it becomes clear that NCSBDE's actions are not "guided

---

[58] Wester, Tr. 1280; Owens, Tr. 1438; White, Tr. 2197, 2208-2209; Hardesty, Tr. 2763-2764; RX51 (Brown, Dep. 101-102); RX56 (Feingold, Dep. 49); RX63 (Holland, Dep. 35); RX65 (Morgan, Dep. 127).  *Also see* White, Tr. 2197-2198; Hardesty, Tr. 2764; RX51 (Brown, Dep. 102, 104); RX52 (Burnham, Dep. 72); RX55 (Efird, Dep. 41); RX56 (Feingold, Dep. 49); RX63 (Holland, Dep. 35-38); RX65 (Morgan, Dep. 127-128).

or determined by separate corporate consciousnesses"—rather, NCSBDE members are guided only by their obligation to enforce NCDPA. *See Am. Needle*, 130 S. Ct. at 2212. NCSBDE members did not voluntarily join together and choose to police their profession *sua sponte.* Rather, the Legislature created NCSBDE to protect the public by preventing the unlicensed practice of dentistry.[59] Thus, one cannot conclude that NCSBDE's enforcement of NCDPA "deprives the marketplace of independent centers of decisionmaking" or a "diversity of entrepreneurial interests." *See id.* at 2213. Only one decision-maker—the Legislature—directed NCSBDE members to take action that would limit the practice of teeth-whitening to dentists.

Most licensee NCSBDE members did not have a "personal financial interest in excluding non-dentist teeth-whitening services." Evidence shows that only three NCSBDE members actually engaged in teeth-whitening services (rather than incidental sales of kits that were not "teeth-whitening services") in their private practices during their terms.[60]

---

[59] By contrast, the U.S. Supreme Court in *American Needle* analyzed whether two defendants that are distinctly different than NCSBDE had the capacity to engage in conspiracy. The first defendant, the NFL, was an unincorporated association that included 32 separately owned professional football teams with separately owned intellectual property. The second defendant, the NFLP, was a separate corporation with its own management that shared most of its revenue with the competing NFL teams on an equal basis.

[60] RX49-6 (Allen, Dep. 18); CX555-4 (Brown, Dep. 8); CX556-39 (Burnham, Dep. 146-147); RX56-4 (Feingold Dep. 10-11); CX565-26 (Hardesty Dep. 98),

| Term | Providing Teeth-Whitening Services | Not Providing Teeth-Whitening Services |
|---|---|---|
| 2005-2006 | Burnham, Hardesty, Owens | Allen, Brown, Efird, Feingold, Hall |
| 2006-2007 | Burnham, Hardesty, Owens | Allen, Efird, Feingold, Hall, Holland |
| 2007-2008 | Burnham, Hardesty, Owens | Efird, Feingold, Hall, Holland, Morgan |
| 2008-2009 | Burnham, Owens | Efird, Hardesty, Holland, Morgan, Sheppard, Wester |
| 2009-2010 | Owens | Hardesty, Hemby, Holland, Morgan, Hardesty, Sadler, Sheppard, Wester |

Thus, at no time was a majority of NCSBDE members actually engaged in the provision of teeth-whitening services. FTC could find a majority only by counting all licensee members as "potential competitors." But, if illegal competitors count, then anyone could be a potential competitor. Following FTC's reasoning, nobody could qualify as a disinterested regulator. FTC's findings on this point were generally verbatim copies of CC's flawed proposed findings which also inflated members' revenues by including sales of products as well as income produced by other dentists in the same offices. [61]

---

Hardesty, Tr. 2804-2805; CX563-14 (Holland, Dep. 49-51); CX564-11 (Hall, Dep. 34); RX65-9 (Morgan, Dep. 30); CX570-44 (Owens, Dep. 169-170), Owens, Tr. 1618-1621; CX572-9 (Wester, Dep. 21-22).
[61] CX467-16; CX378-1-2; Owens Tr. 1589-1590.

**B.    NCSBDE Did Not Actually Engage in Concerted Action.**

**1.    CC Did Not Prove that NCSBDE Had a Conscious Commitment to a Common Scheme Designed to Achieve an Unlawful Objective.**

To establish an actual conspiracy, combination, or contract that embodies unlawful concerted action, FTC "must discharge a twofold evidentiary burden." *Laurel Sand & Gravel,* 924 F.2d at 543.  First, FTC must prove that NCSBDE "had a conscious commitment to a common scheme designed to achieve an **unlawful objective**."  *Id.* (citing *Monsanto Co*, 465 U.S. at 764) (emphasis added).

FTC concluded that that NCSBDE had a "common plan to exclude non-dentist teeth-whitening providers from the market."  Opinion-17.  This finding was based on FTC's conclusion that, "[o]n several occasions, the [NCSBDE] discussed teeth-whitening services provided by non-dentists and then voted to take action to restrict these services."  Opinion-17.  These discussions and votes were precipitated by complaints to NCSBDE about non-dentist teeth-whitening services.  Opinion-4.  FTC also found that NCSBDE sent C&Ds to various non-dentist teeth-whitening providers and other third parties that were similar in substance and that had a "common objective of discouraging non-dentist teeth-whitening."  Opinion-18.

FTC assumed that NCDPA was clearly-articulated, but refused to consider the statutorily-mandated efforts by the NCSBDE to obtain compliance with the

47

statute. This Court has held that the fact "[t]hat the challenged conduct . . . is consistent with legitimate activities . . . weighs against inferring a conspiracy." *Cooper v. Forsyth County Hosp. Auth.*, 789 F.2d 278, 282 n.14 (4th Cir. 1986) (considering, as a legitimate reason weighing against an inference of conspiracy, evidence that the N.C. Orthopedic Association ("NCOA") discussed their position against granting podiatrists surgical privileges at a hospital during their meetings and with the hospital's bylaws committee in order to protect the quality of patient care). There is absolutely no evidence that NCSBDE members engaged in the challenged actions for any reason **other** than to uphold state law protecting the health, safety, and welfare—a legitimate activity. *See also Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 224-25 (4th Cir. 2004) (Although medical doctors and insurance companies do not generally share a unity of interest, the parties shared a common interest to address clinical issues in a way that would best serve patients. Therefore, no conspiracy existed.).

In *Thompson Everett, Inc. v. National Cable Advertising,* this Court addressed the circumstances under which an "unlawful objective" could be inferred to determine the existence of a conspiracy. 57 F.3d 1317 (4th Cir. 1995). The plaintiff alleged that cable representatives were interpreting and enforcing their exclusive contracts with cable television companies in a concerted effort to exclude it from the market. *Id.* at 1319. The Court affirmed that defendants did

48

not pursue an illegal conspiracy by seeking to enforce their exclusive contract "because, unless the exclusive contracts were themselves illegal, any concerted activity was not aimed at achieving an unlawful objective." *Id.* at 1324. Therefore, although the defendants shared information with the cable television companies about the benefits of contract enforcement, there was no evidence that the defendants "embarked on a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.*

Applying the holding in *Thompson* to this case, FTC erred in concluding that enforcement of a "clearly-articulated statute" could constitute an antitrust conspiracy. Furthermore, FTC erred in concluding that a "common scheme" was responsible for excluding illegal dental service providers because such exclusion already was mandated by state statute. *See Dickson v. Ebert*, 309 F.3d 193, 210 (4th Cir. 2002) ("The relevant focus of the §1 inquiry . . . is the anticompetitive effects of the conspiracy *qua* conspiracy; therefore, the plaintiff must demonstrate that the **conspiratorial agreement itself** affected competition in ways that [it] would not have obtained absent the agreement") (emphasis added).

### 2. Evidence Did Not Tend to Exclude the Possibility that NCSBDE and Licensee Members Acted Independently.

CC was also required to produce evidence tending "to exclude the possibility that the alleged conspirators acted independently" to meet the second prong of its "twofold evidentiary burden." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

49

475 U.S. 574, 588 (1986) (citing *Monsanto Co.*, 465 U.S. 752, 764). The evidence produced was required to "reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Monsanto Co.*, 465 U.S. at 764 (internal citation omitted); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 878 F.2d 801, 805 (4th Cir. 1989). In light of the whole record, CC failed to do so, and FTC erred in finding actual concerted action.

The evidence showed that NCSBDE handled investigations into allegations of unlawful teeth-whitening services in the same manner as it approached other investigations into the unauthorized practice of dentistry. IDF at 176-183. This evidence supports an inference of independent conduct, rather than conspiracy. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *25-*27, *30 (4th Cir. Sept. 7, 1999) (*per curiam*) (unpublished) (finding that challenged activity by defendant was consistent with normal business practices and therefore did not support inference of conspiracy).

Second, there is no evidence to exclude the possibility that NCSBDE members took the challenged actions for any reason **other** than to protect the health, safety, and welfare of citizens. The evidence presented at trial strongly indicates that the actions of each member were taken independently to uphold the statute, especially as there is no showing that the decisions of any member were

influenced by another member.  *See Precision Piping & Instruments, Inc. v. E.I. DuPont de Nemours & Co*., 951 F.2d 617, 618 (4th Cir. 1991) (finding no concerted action when plaintiff did not exclude the possibility that defendants engaged in independent action, when defendants acted in accordance with pre-existing policies of an association and there was no evidence that the defendants were influenced by one another's actions).

Third, there is no evidence to exclude the possibility that the members of NCSBDE acted to maintain the professional reputation of dentists by upholding NCDPA.  Such interests have been recognized as legitimate by this Court.  In *Oksanen*, a peer review program was determined to be "a legitimate activity designed to enhance the quality of care and to provide a harmonious working environment for all the hospital's staff."  945 F.2d at 706).

FTC relies heavily on evidence that NCSBDE "delivered a consistent message over a period of several years to numerous and various types of third parties," primarily in response to complaints from North Carolina dentists about illegal dental service providers to support its contention that the members did not act independently.  Opinion-18.  However, as this Court repeatedly has held, such evidence is not enough to find unlawful concerted action.

For instance, in *Parkway Gallery Furniture v. Kittinger/Pennsylvania House Group, Inc.*, two discount furniture dealers alleged that a furniture manufacturer

51

engaged in unlawful concerted action when it sought assurances from its dealers that they would not sell furniture outside of specified areas.  878 F.2d at 802-03. The defendant implemented this policy because other dealers complained to defendant about losing business due to plaintiffs' discounted deals.  Before implementing this policy, defendant discussed with its dealers similar policies adopted by other manufacturers.  *Id.*  This Court held that the evidence "simply does not add the 'something more' required by *Monsanto*" and that the plaintiffs failed to demonstrate the existence of a conspiracy.  *Id*. at 806.

Likewise, in *Cooper v. Forsyth County Hosp. Authority*, two podiatrists brought an antitrust lawsuit after being denied surgical privileges at a hospital. They alleged a conspiracy between the hospital, the hospital's board of trustees, certain members of the hospital staff, and NCOA to exclude podiatrists.  789 F.2d at 279-80.   The evidence presented by the plaintiffs consisted "primarily of contacts and communications" among the defendants, when: 1) the NCOA discussed podiatry at their general meeting; 2) the NCOA communicated its position against surgical privileges for podiatrists to its members; 3) orthopedists communicated their opposition regarding surgical privileges to the hospital's bylaws committee; and (4) the hospital's bylaws committee recommended to the hospital's trustees that podiatrists be denied surgical privileges.   This Court affirmed summary judgment for the defendants, finding that this circumstantial

evidence did not tend to exclude the possibility of independent action; to hold otherwise "would cross the line between reasonable inferences and mere speculation." *Id.* at 281.

Applying the holdings of *Parkway Gallery Furniture* and *Cooper* here, it is clear that the evidence is insufficient to exclude the possibility of independent action. NCSBDE's communications that unlicensed teeth-whitening services could violate NCDPA does not satisfy the high evidentiary bar set by *Monsanto* and its progeny.

Without evidence of collusion, FTC has, in effect, deemed all state agencies with licensee majorities to be *ipso facto* or *per se* antitrust conspiracies even when enforcing explicit statutory restraints. If excluding unqualified practice is an unreasonable restraint, licensing, discipline and unauthorized practice enforcement by any board, commission or bar, are subject to the same dangerous logic. However, federal circuits repeatedly have declined to find the existence of a conspiracy solely on the basis of a single entity's composition. *See, e.g., Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 764-65 (5th Cir. 2002) (affirming that a trade association did not engage in conspiracy by suspending plaintiff for violating ethics rules when plaintiff could not show that the proceedings were a sham or that the standards applied were merely a pretext). "**Despite the fact that a trade association by its nature involves collective action by competitors, it is not by**

53

its nature a '**walking conspiracy**,' its every denial of some benefit amounting to an unreasonable restraint of trade." *Id.* at 764 (internal citation omitted and emphasis added). This recognition is even stronger when, as here, the actions are taken by a state agency acting pursuant to state law.

Because CC has failed to show that: 1) NCSBDE is capable of engaging in concerted action; and 2) NCSBDE in fact engaged in concerted action, FTC's Final Order must be vacated.

## V.    NCSBDE DID NOT UNREASONABLY RESTRAIN TRADE.

Assuming it could prove concerted action, CC was also required to demonstrate that NCSBDE unreasonably restrained trade in the relevant market, affecting interstate commerce. *Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). FTC's Opinion held such a restraint occurred. Opinion-10. Finding this, the Opinion purportedly analyzed NCSBDE's conduct for any procompetitive justification and found none. Opinion-13 *et seq.* In fact, there was no restraint on legal trade in the relevant market. Given that only **unreasonable** restraints of trade are prohibited by FTCA, NCSBDE's conduct is saved by procompetitive justifications.

### A.    NCSBDE Did Not Restrain Trade in the Relevant Market.

Applying three variations of the "rule of reason" test, FTC concluded that NCSBDE restrained trade. However, the analysis and conclusions are flawed.

54

Only a full rule of reason analysis was appropriate. There is no legal support for the application of a truncated analysis, wherein the burden of proof shifted to NCSBDE and factors such as determining the relevant market are ignored. Truncated analysis is appropriate only to cases that share a "close family resemblance" with a practice that "already stands convicted in the court of consumer welfare." *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36-37 (D.C. Cir. 2005).

Second, regardless of the type of analysis applied, FTC concluded that a **majority licensee state agency can never claim as a procompetitive justification that it acted pursuant to state law that was enacted to protect the public health**. Opinion-23 *et seq.* Essentially, any enforcement of an unauthorized practice statute is a *de facto* violation of FTCA. Indeed, FTC's stance is that a clearly-authorizing state law is not grounds to prevent unlicensed stain removal services, but is grounds for actions against all other activities prohibited under N.C.G.S. §90-29(b). Order-3 *et seq.* This contradiction must be resolved.

## B. NCSBDE's Actions Are Legal Under a "Quick Look" Rule of Reason Test.

FTC's Opinion asserts that NCSBDE's conduct was inherently suspect and thus deserving of a "quick look" rule of reason analysis because it "exclude[d] a lower-cost and popular group of competitors." Opinion-19. However, NCSBDE's

conduct cannot be prejudged inherently suspect given that no court has ever applied a rule of reason analysis to a state agency acting pursuant to state law. Further, FTC's truncated analysis applies inapplicable cases, wherein private actors acted without a state mandate. Opinion-21-23. The Opinion even declares that state agencies raise greater competitive concern than private organizations. Opinion-22-23. In particular, FTC misconstrues two cases involving trade associations subject to a "quick look" analysis. *See Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982); *see also Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492 (1988) (both concerning private associations promulgating standards adopted in piecemeal fashion by governments). There is no basis in federal case law for finding that state agencies acting pursuant to state law are subject to, and fail, a "quick look" rule of reason analysis.

### C. NCSBDE's Actions Are Legal Under a Traditional Rule of Reason Test.

NCSBDE has not violated FTCA under a traditional rule of reason analysis, wherein the relevant market is analyzed for direct or indirect evidence of harm. Opinion-29 *et seq.* The evidence demonstrates that NCSBDE's actions against teeth whitening service providers affected only **illegal** conduct. There is no direct or indirect evidence that NCSBDE's conduct restrained trade in legal teeth-whitening services in N.C. Teeth whitening industry representatives have not testified that the NCSBDE's actions had any impact on their legal sales. NCSBDE

was compelled to act on *prima facie* evidence of a NCDPA violation.  *United States v. Am. Tobacco Co.*, 221 U.S. 106, 179 (1911) (the term "restraint of trade" embraces "acts or contracts or agreements or combinations which operated to the prejudice of the public interest").

### 1.    NCSBDE's Enforcement of State Law Does Not Violate the Rule of Reason Because It Was Mandated for Public Protection.

Actions that would otherwise constitute a violation of federal antitrust laws may be saved if they are motivated by a "countervailing procompetitive virtue." *Indiana Federation*, 476 U.S. at 459.  Federal antitrust laws are written to protect the right to competition, not the rights of competitors.  *Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) ("[A] practice is not 'anticompetitive' simply because it harms competitors. . . . a practice is 'anticompetitive' only if it harms the competitive process").  Here, there are two justifications:  NCSBDE acted pursuant to state law, and both the NCSBDE and state law were motivated by public protection concerns.

Federal case law demonstrates the intent of the courts to exclude from the application of antitrust laws actions taken to further public policy aims.  *Ariz. v. Maricopa County Med. Soc'y*, 457 U.S. 332, 349 (1982) (courts recognize and weigh procompetitive justifications of "public service or ethical norms"); *see also, e.g., United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993) (upholding

private universities' tuition agreement, based on their procompetitive justification that it aided low-income students); *Pocono Invitational Sports Camp, Inc. v. NCAA*, 317 F. Supp. 2d 569, 584 (E.D. Pa. 2004) (finding NCAA regulations enacted to promote fair competition and academic excellence non-violative of the rule of reason). Surely the enforcement of a state law enacted to protect the public is as legitimate a justification as can be put forth by a private association acting without a state mandate.

Courts also view agreements between professionals in a more permissive light than agreements between private competitors. *Maricopa County Med. Soc'y*, 457 U.S. 332, 348 (internal citation omitted) ("The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. . . . The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently."); *see also Gambrel*, 689 F.2d at 618 (a state agency's actions "are compelled by [the state's] statutory scheme of regulation of the practice of dentistry . . . and conduct of the defendant[] emanates directly from the mandate of state law in a well-developed and long-established statutory scheme").

FTC itself, in other sources, acknowledges that "sound competition policy calls for competition to be restricted . . . when necessary to protect the public from significant harm." Commission Letter to Teneale Johnson, Maine Board of Dental Examiners, Nov. 16, 2011.[62] FTC elsewhere understands that state legislatures should consider health and safety concerns and may restrain competition to protect the public.[63]

### 2. Procompetitive Justification Cases Relied on by FTC Are Distinguishable.

FTC primarily relies on three easily distinguishable cases to support its opposition to the NCSBDE's procompetitive justifications, all involving private entities, not state agencies acting pursuant to state law. Opinion-23-26. *Indiana Federation*, 476 U.S. 447 (1986) and *National Society of Professional Engineers* 435 U.S. 679 (1978) both concern private trade associations acting pursuant to internal rules, not state agencies acting pursuant to state law. The Fourth Circuit's decision in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir. 1980) also concerned a private association, in that instance acting contrary to a clear state statute. *Id.* 478.

---

[62] *Available at* http://ftc.gov/os/2011/11/111125mainedental.pdf.

[63] *See also* FTC Letter to The Honorable Rodney Ellis, May 11, 2011, *available at* http://ftc.gov/os/2011/05/V110007texasaprn.pdf (noting that "[p]atient safety or consumer protection concerns may justify licensure requirements and scope of practice restrictions. FTC staff recognize that particular health care procedures may require specialized training or heightened supervision if they are to be safely administered.").

In contrast, the Legislature—not NCSBDE or private actors—determined that stain removal from teeth constitutes the practice of dentistry. "Long-standing precedent holds that 'a state may . . . prescribe that only persons possessing the reasonably necessary qualifications of learning and skill shall practice medicine or dentistry.'" *Graves v. Minnesota*, 272 U.S. 425, 426 (1926) (citing *Dent v. West Virginia*, 129 U.S. 114, 122 (1889)). NCSBDE's efforts to obtain compliance with clear public protection statutes were procompetitive because they protected legal competition and the public. NCSBDE did no more than protect the public from illegal operators. *Goldfarb*, 421 U.S. at 792 ("States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions").

## CONCLUSION

FTC's rulings on dispositive motions and its Opinion should be reversed and its Final Order vacated.

## REQUEST FOR ORAL ARGUMENT

NCSBDE hereby respectfully requests oral argument of the issues presented in its brief. These are novel issues that would benefit from oral argument before this Honorable Court.

Respectfully submitted, this the 10th day of May, 2012.

/s/ Noel L. Allen

Noel L. Allen
M. Jackson Nichols
Catherine E. Lee
Nathan E. Standley
Brie A. Allen, of counsel
ALLEN, PINNIX & NICHOLS, P.A.
Post Office Drawer 1270
Raleigh, North Carolina 27602
Telephone: 919-755-0505
Facsimile: 919-829-8098
Email: nallen@allen-pinnix.com
        mjn@allen-pinnix.com
        clee@allen-pinnix.com
        nstandley@allen-pinnix.com
        ballen@allen-pinnix.com

Counsel for Petitioner

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Petitioner affirms and declares as follows:

This brief complies with the type-volume limitation of Fed. R. App. 29(d) and Fed. R. App. P. Rule 32(a)(7) for a brief utilizing proportionally-spaced font, because the length of this brief is 13,944 words, excluding the parts of the brief exempted by Fed. R. App. P. Rule 32(a)(7)(B)(iii).

This brief also complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Executed this 10th day of May, 2012.

s/  Noel L. Allen
Noel L. Allen

*Attorney for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the Appellate CM/ECF System on May 10, 2012.

I certify that all parties to this case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF System.

Executed this 10th day of May, 2012.

s/   Noel L. Allen
Noel L. Allen

*Attorney for Appellant*

# ADDENDUM

## U.S. Constitution Provisions

*Tenth Amendment*

Powers reserved to states or people:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

## United States Code

*5 U.S.C. § 706.  Scope of review*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

  (1) compel agency action unlawfully withheld or unreasonably delayed; and

  (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

*15 U.S.C. § 45. Unfair methods of competition unlawful; prevention by Commission*

(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade.

>   (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

>   (2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 18(f)(3) [15 USCS § 57a(f)(3)], Federal credit unions described in section 18(f)(4) [15 USCS § 57a(f)(4)], common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958 [49 USCS §§ 40101 et seq.], and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 USCS §§ 181 et seq.], except as provided in section 406(b) of said Act [7 USCS § 227(b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

(b) Proceeding by Commission; modifying and setting aside orders. Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or

corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this Act, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require, except that (1) the said person, partnership, or corporation may, within sixty days after the service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section; and (2) in the case of an order, the Commission shall reopen any such order to consider whether such order (including any affirmative relief provision contained in such order) should be altered, modified, or set aside, in whole or in part, if the person, partnership, or corporation involved files a request with the Commission which makes a satisfactory showing that changed conditions of law or fact require such order to be altered, modified, or set aside, in whole or in part. The Commission shall determine whether to alter, modify, or set aside any order of the Commission in response to a request made by a person, partnership, or corporation under paragraph [clause] (2) not later than 120 days after the date of the filing of such request.

(c) Review of order; rehearing. Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the [circuit]

court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record in the proceeding, as provided in section 2112 of title 28, United States Code. Upon such filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission until the filing of the record and shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 240 of the Judicial Code [28 USCS § 1254].

## North Carolina Constitution

*N.C. Const. art. I, § 34.  Perpetuities and monopolies*

Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed.

*N.C. Const. art. VI, § 7.  Oath*

Before entering upon the duties of an office, a person elected or appointed to the office shall take and subscribe the following oath:

   "I, _____, do solemnly swear (or affirm) that I will support and maintain the Constitution and laws of the United States, and the Constitution and laws of North Carolina not inconsistent therewith, and that I will faithfully discharge the duties of my office as _____, so help me God."

<u>North Carolina Statutes</u>

*N.C. Gen. Stat. § 14-230.  Willfully failing to discharge duties*

If any clerk of any court of record, sheriff, magistrate, school board member, county commissioner, county surveyor, coroner, treasurer, or official of any of the State institutions, or of any county, city or town, shall willfully omit, neglect or refuse to discharge any of the duties of his office, for default whereof it is not elsewhere provided that he shall be indicted, he shall be guilty of a Class 1 misdemeanor. If it shall be proved that such officer, after his qualification, willfully and corruptly omitted, neglected or refused to discharge any of the duties of his office, or willfully and corruptly violated his oath of office according to the true intent and meaning thereof, such officer shall be guilty of misbehavior in office, and shall be punished by removal therefrom under the sentence of the court as a part of the punishment for the offense.

HISTORY: 1901, c. 270, s. 2; Rev., s. 3592; C.S., s. 4384; 1943, c. 347; 1973, c. 108, s. 5; 1993, c. 539, s. 142; 1994, Ex. Sess., c. 24, s. 14(c); 2009-107, s. 1.

*N.C. Gen. Stat. § 55B-9.  Professional relationship and liability*

(a) Relationship. -- Nothing in this Chapter shall be interpreted to abolish, modify, restrict, limit or alter the law in this State applicable to the professional relationship and liabilities between the licensee furnishing the professional services and the person receiving such professional service, or the standards of professional conduct applicable to the rendering therein of such services.

(b) Liability. -- A shareholder, a director, or an officer of a professional corporation is not individually liable, directly or indirectly, including by

indemnification, contribution, assessment, or otherwise, for the debts, obligations, and liabilities of, or chargeable to, the professional corporation that arise from errors, omissions, negligence, malpractice, incompetence, or malfeasance committed by another shareholder, director, or officer or by a representative of the professional corporation; provided, however, nothing in this Chapter shall affect the liability of a shareholder, director, or officer of a professional corporation for his or her own errors, omissions, negligence, malpractice, incompetence, or malfeasance committed in the rendering of professional services.

*N.C. Gen. Stat. § 90-22(a) & (b). Practice of dentistry regulated in public interest; Article liberally construed; Board of Dental Examiners; composition; qualifications and terms of members; vacancies; nominations and elections; compensation; expenditures by Board*

(a)  The practice of dentistry in the State of North Carolina is hereby declared to affect the public health, safety and welfare and to be subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that the dental profession merit and receive the confidence of the public and that only qualified persons be permitted to practice dentistry in the State of North Carolina. This Article shall be liberally construed to carry out these objects and purposes.

(b)  The North Carolina State Board of Dental Examiners heretofore created by Chapter 139, Public Laws 1879 and by Chapter 178, Public Laws 1915, is hereby continued as the agency of the State for the regulation of the practice of dentistry in this State. Said Board of Dental Examiners shall consist of six dentists who are licensed to practice dentistry in North Carolina, one dental hygienist who is licensed to practice dental hygiene in North Carolina and one person who shall be a citizen and resident of North Carolina and who shall be licensed to practice neither dentistry nor dental hygiene. The dental hygienist or the consumer member cannot participate or vote in any matters of the Board which involves the issuance, renewal or revocation of the license to practice dentistry in the State of North Carolina. The consumer member cannot participate or vote in any matters of the Board which involve the issuance, renewal or revocation of the license to practice dental hygiene in the State of North Carolina. Members of the Board licensed to practice dentistry in North Carolina shall have been elected in an election held as hereinafter provided in which every person licensed to practice dentistry in North Carolina and residing or practicing in North Carolina shall be entitled to vote. Each member of said Board shall be elected for a term of three years and until his successor shall be elected and shall qualify. Each year there shall be elected two

69

dentists for such terms of three years each. Every three years there shall be elected one dental hygienist for a term of three years. Dental hygienists shall be elected to the Board in an election held in accordance with the procedures hereinafter provided in which those persons licensed to practice dental hygiene in North Carolina and residing or practicing in North Carolina shall be entitled to vote. Every three years a person who is a citizen and resident of North Carolina and licensed to practice neither dentistry nor dental hygiene shall be appointed to the Board for a term of three years by the Governor of North Carolina. Any vacancy occurring on said Board shall be filled by a majority vote of the remaining members of the Board to serve until the next regular election conducted by the Board, at which time the vacancy will be filled by the election process provided for in this Article, except that when the seat on the Board held by a person licensed to practice neither dentistry nor dental hygiene in North Carolina shall become vacant, the vacancy shall be filled by appointment by the Governor for the period of the unexpired term. No dentist shall be nominated for or elected to membership on said Board, unless, at the time of such nomination and election such person is licensed to practice dentistry in North Carolina and actually engaged in the practice of dentistry. No dental hygienist shall be nominated for or elected to membership on said Board unless, at the time of such nomination and election, such person is licensed to practice dental hygiene in North Carolina and is currently employed in dental hygiene in North Carolina. No person shall be nominated, elected, or appointed to serve more than two consecutive terms on said Board.

…

HISTORY: 1935, c. 66, s. 1; 1957, c. 592, s. 1; 1961, c. 213, s. 1; 1971, c. 755, s. 1; 1973, c. 1331, s. 3; 1979, 2nd Sess., c. 1195, ss. 1-5; 1981, c. 751, ss. 1, 2; 1987, c. 827, s. 1.

*N.C. Gen. Stat. § 90-29.  Necessity for license; dentistry defined; exemptions*

(a)  No person shall engage in the practice of dentistry in this State, or offer or attempt to do so, unless such person is the holder of a valid license or certificate of renewal of license duly issued by the North Carolina State Board of Dental Examiners.

(b)  A person shall be deemed to be practicing dentistry in this State who does, undertakes or attempts to do, or claims the ability to do any one or more of the following acts or things which, for the purposes of this Article, constitute the practice of dentistry:

…

(2)  Removes stains, accretions or deposits from the human teeth;

…

(7)  Takes or makes an impression of the human teeth, gums or jaws;

…

(10)  Performs or engages in any of the clinical practices included in the curricula of recognized dental schools or colleges;

…

(11)  Owns, manages, supervises, controls or conducts, either himself or by and through another person or other persons, any enterprise wherein any one or more of the acts or practices set forth in subdivisions (1) through (10) above are done, attempted to be done, or represented to be done;

…

(13)  Represents to the public, by any advertisement or announcement, by or through any media, the ability or qualification to do or perform any of the acts or practices set forth in subdivisions (1) through (10) above.

…

HISTORY: 1935, c. 66, s. 6; 1953, c. 564, s. 3; 1957, c. 592, s. 2; 1961, c. 446, s. 2; 1965, c. 163, ss. 1, 2; 1971, c. 755, s. 2; 1977, c. 368; 1979, 2nd Sess., c. 1195, ss. 10, 15; 1991, c. 658, s. 1; c. 678, ss. 1, 2; 1997-481, ss. 5, 6; 2002-37, s. 8.

*N.C. Gen. Stat. § 90-40.   Unauthorized practice; penalty*

If any person shall practice or attempt to practice dentistry in this State without first having passed the examination and obtained a license from the North Carolina Board of Dental Examiners or having obtained a provisional license from said Board; or if he shall practice dentistry after March 31 of each year without applying for a certificate of renewal of license, as provided in G.S. 90-31; or shall

practice or attempt to practice dentistry while his license is revoked, or suspended, or when a certificate of renewal of license has been refused; or shall violate any of the provisions of this Article for which no specific penalty has been provided; or shall practice or attempt to practice, dentistry in violation of the provisions of this Article; or shall practice dentistry under any name other than his own name, said person shall be guilty of a Class 1 misdemeanor. Each day's violation of this Article shall constitute a separate offense.

HISTORY: 1935, c. 66, s. 13; 1953, c. 564, s. 6; 1957, c. 592, s. 4; 1965, c. 163, s. 6; 1969, c. 804, s. 2; 1993, c. 539, s. 619; 1994, Ex. Sess., c. 24, s. 14(c).

*N.C. Gen. Stat. § 90-40.1.  Enjoining unlawful acts*

(a) The practice of dentistry by any person who has not been duly licensed so as to practice or whose license has been suspended or revoked, or the doing, committing or continuing of any of the acts prohibited by this Article by any person or persons, whether licensed dentists or not, is hereby declared to be inimical to public health and welfare and to constitute a public nuisance. The Attorney General for the State of North Carolina, the district attorney of any of the superior courts, the North Carolina State Board of Dental Examiners in its own name, or any resident citizen may maintain an action in the name of the State of North Carolina to perpetually enjoin any person from so unlawfully practicing dentistry and from the doing, committing or continuing of such unlawful act. This proceeding shall be in addition to and not in lieu of criminal prosecutions or proceedings to revoke or suspend licenses as authorized by this Article.

(b) In an action brought under this section the final judgment, if in favor of the plaintiff, shall perpetually restrain the defendant or defendants from the commission or continuance of the act or acts complained of. A temporary injunction to restrain the commission or continuance thereof may be granted upon proof or by affidavit that the defendant or defendants have violated any of the laws or statutes applicable to unauthorized or unlawful practice of dentistry. The provisions of the statutes or rules relating generally to injunctions as provisional remedies in actions shall apply to such a temporary injunction and the proceedings thereunder.

(c) The venue for actions brought under this section shall be the superior court of any county in which such acts constituting unlicensed or unlawful practice of dentistry are alleged to have been committed or in which there appear reasonable

grounds to believe that they will be committed or in the county where the defendants in such action reside.

(d) The plaintiff in such action shall be entitled to examination of the adverse party and witnesses before filing complaint and before trial in the same manner as provided by law for the examination of the parties.

HISTORY: 1957, c. 592, s. 5; 1973, c. 47, s. 2.

*N.C. Gen. Stat. § 90-41.  Disciplinary action*

(a) The North Carolina State Board of Dental Examiners shall have the power and authority to (i) Refuse to issue a license to practice dentistry; (ii) Refuse to issue a certificate of renewal of a license to practice dentistry; (iii) Revoke or suspend a license to practice dentistry; and (iv) Invoke such other disciplinary measures, censure, or probative terms against a licensee as it deems fit and proper;

in any instance or instances in which the Board is satisfied that such applicant or licensee:

  (1) Has engaged in any act or acts of fraud, deceit or misrepresentation in obtaining or attempting to obtain a license or the renewal thereof;

  (2) Is a chronic or persistent user of intoxicants, drugs or narcotics to the extent that the same impairs his ability to practice dentistry;

  (3) Has been convicted of any of the criminal provisions of this Article or has entered a plea of guilty or nolo contendere to any charge or charges arising therefrom;

  (4) Has been convicted of or entered a plea of guilty or nolo contendere to any felony charge or to any misdemeanor charge involving moral turpitude;

  (5) Has been convicted of or entered a plea of guilty or nolo contendere to any charge of violation of any state or federal narcotic or barbiturate law;

  (6) Has engaged in any act or practice violative of any of the provisions of this Article or violative of any of the rules and regulations promulgated and adopted by the Board, or has aided, abetted or assisted any other person or entity in the violation of the same;

73

(7) Is mentally, emotionally, or physically unfit to practice dentistry or is afflicted with such a physical or mental disability as to be deemed dangerous to the health and welfare of his patients. An adjudication of mental incompetency in a court of competent jurisdiction or a determination thereof by other lawful means shall be conclusive proof of unfitness to practice dentistry unless or until such person shall have been subsequently lawfully declared to be mentally competent;

(8) Has conducted in-person solicitation of professional patronage or has employed or procured any person to conduct such solicitation by personal contact with potential patients, except to the extent that informal advice may be permitted by regulations issued by the Board of Dental Examiners;

(9) Has permitted the use of his name, diploma or license by another person either in the illegal practice of dentistry or in attempting to fraudulently obtain a license to practice dentistry;

(10) Has engaged in such immoral conduct as to discredit the dental profession;

(11) Has obtained or collected or attempted to obtain or collect any fee through fraud, misrepresentation, or deceit;

(12) Has been negligent in the practice of dentistry;

(13) Has employed a person not licensed in this State to do or perform any act or service, or has aided, abetted or assisted any such unlicensed person to do or perform any act or service which under this Article or under Article 16 of this Chapter, can lawfully be done or performed only by a dentist or a dental hygienist licensed in this State;

(14) Is incompetent in the practice of dentistry;

(15) Has practiced any fraud, deceit or misrepresentation upon the public or upon any individual in an effort to acquire or retain any patient or patients;

(16) Has made fraudulent or misleading statements pertaining to his skill, knowledge, or method of treatment or practice;

(17) Has committed any fraudulent or misleading acts in the practice of dentistry;

(18) Has, directly or indirectly, published or caused to be published or disseminated any advertisement for professional patronage or business which is untruthful, fraudulent, misleading, or in any way inconsistent with rules and regulations issued by the Board of Dental Examiners governing the time, place, or manner of such advertisements;

(19) Has, in the practice of dentistry, committed an act or acts constituting malpractice;

(20) Repealed by Session Laws 1981, c. 751, s. 7.

(21) Has permitted a dental hygienist or a dental assistant in his employ or under his supervision to do or perform any act or acts violative of this Article, or of Article 16 of this Chapter, or of the rules and regulations promulgated by the Board;

(22) Has wrongfully or fraudulently or falsely held himself out to be or represented himself to be qualified as a specialist in any branch of dentistry;

(23) Has persistently maintained, in the practice of dentistry, unsanitary offices, practices, or techniques;

(24) Is a menace to the public health by reason of having a serious communicable disease;

(25) Has distributed or caused to be distributed any intoxicant, drug or narcotic for any other than a lawful purpose; or

(26) Has engaged in any unprofessional conduct as the same may be, from time to time, defined by the rules and regulations of the Board.

(b) If any person engages in or attempts to engage in the practice of dentistry while his license is suspended, his license to practice dentistry in the State of North Carolina may be permanently revoked.

(c) The Board may, on its own motion, initiate the appropriate legal proceedings against any person, firm or corporation when it is made to appear to the Board that such person, firm or corporation has violated any of the provisions of this Article or of Article 16.

(d) The Board may appoint, employ or retain an investigator or investigators for the purpose of examining or inquiring into any practices committed in this State that might violate any of the provisions of this Article or of Article 16 or any of the rules and regulations promulgated by the Board.

(e) The Board may employ or retain legal counsel for such matters and purposes as may seem fit and proper to said Board.

(f) As used in this section the term "licensee" includes licensees, provisional licensees and holders of intern permits, and the term "license" includes license, provisional license, instructor's license, and intern permit.

(g) Records, papers, and other documents containing information collected or compiled by the Board, or its members or employees, as a result of investigations, inquiries, or interviews conducted in connection with a licensing or disciplinary matter, shall not be considered public records within the meaning of Chapter 132 of the General Statutes; provided, however, that any notice or statement of charges against any licensee, or any notice to any licensee of a hearing in any proceeding, shall be a public record within the meaning of Chapter 132 of the General Statutes, notwithstanding that it may contain information collected and compiled as a result of any investigation, inquiry, or interview; and provided, further, that if any record, paper, or other document containing information collected and compiled by the Board is received and admitted into evidence in any hearing before the Board, it shall then be a public record within the meaning of Chapter 132 of the General Statutes.

HISTORY: 1935, c. 66, s. 14; 1957, c. 592, s. 7; 1965, c. 163, s. 4; 1967, c. 451, s. 1; 1971, c. 755, s. 9; 1979, 2nd Sess., c. 1195, ss. 7, 8; 1981, c. 751, s. 7; 1989, c. 442; 1997-456, s. 27; 2002-37, s. 9.

*N.C. Gen. Stat. § 90-233.  Practice of dental hygiene*

(a)   A dental hygienist may practice only under the supervision of one or more licensed dentists. This subsection shall be deemed to be complied with in the case of dental hygienists employed by or under contract with a local health department or State government dental public health program and especially trained by the Dental Health Section of the Department of Health and Human Services as public health hygienists, while performing their duties for the persons officially served by the local health department or State government program under the direction of a

duly licensed dentist employed by that program or by the Dental Health Section of the Department of Health and Human Services.

(a1) A dental hygienist who has three years of experience in clinical dental hygiene or a minimum of 2,000 hours performing primarily prophylaxis or periodontal debridement under the supervision of a licensed dentist, who completes annual CPR certification, who completes six hours each year of Board-approved continuing education in medical emergencies in addition to the requirements of G.S. 90-225.1, and who is designated by the employing dentist as being capable of performing clinical hygiene procedures without the direct supervision of the dentist, may perform one or more dental hygiene functions as described in G.S. 90-221(a) without a licensed dentist being physically present if all of the following conditions are met:

(1) A licensed dentist directs in writing the hygienist to perform the dental hygiene functions.

(2) The licensed dentist has personally conducted an evaluation of the patient which shall include a complete oral examination of the patient, a thorough analysis of the patient's health history, a diagnosis of the patient's condition, and a specific written plan for treatment.

(3) The dental hygiene functions directed to be performed in accordance with this subsection shall be conducted within 120 days of the dentist's evaluation.

(4) The services are performed in nursing homes; rest homes; long-term care facilities; rural and community clinics operated by Board-approved nonprofits; rural and community clinics operated by federal, State, county, or local governments; and any other facilities identified by the Office of Rural Health and approved by the Board as serving dental access shortage areas.

(a2) A dental hygienist shall not establish or operate a separate care facility that exclusively renders dental hygiene services.

(a3) A dental hygienist who has been disciplined by the Board may not practice outside the direct supervision of a dentist under G.S. 90-233(a1). A dentist who has been disciplined by the Board may not allow a hygienist to work outside of that dentist's direct supervision under G.S. 90-233(a1).

(a4) Each dentist who chooses to order dental hygiene services under G.S. 90-233(a1) shall report annually to the Board the number of patients who were treated outside the direct supervision of the dentist, the location in which the services were performed by the hygienist, and a description of any adverse circumstances which occurred during or after the treatment, if any. The dentist's report shall not identify hygienists or patients by name or any other identifier.

(a5) Clinical dental hygiene services shall be provided in compliance with both CDC and OSHA standards for infection control and patient treatment.

(b) A dentist in private practice may not employ more than two dental hygienists at one and the same time who are employed in clinical dental hygiene positions.

(c) Dental hygiene may be practiced only by the holder of a license or provisional license currently in effect and duly issued by the Board. The following acts, practices, functions or operations, however, shall not constitute the practice of dental hygiene within the meaning of this Article:

  (1) The teaching of dental hygiene in a school or college approved by the Board in a board-approved program by an individual licensed as a dental hygienist in any state in the United States.

  (2) Activity which would otherwise be considered the practice of dental hygiene performed by students enrolled in a school or college approved by the Board in a board-approved dental hygiene program under the direct supervision of a dental hygienist or a dentist duly licensed in North Carolina or qualified for the teaching of dentistry pursuant to the provisions of G.S. 90-29(c)(3), acting as an instructor.

  (3) Any act or acts performed by an assistant to a dentist licensed to practice in this State when said act or acts are authorized and permitted by and performed in accordance with rules and regulations promulgated by the Board.

  (4) Dental assisting and related functions as a part of their instructions by students enrolled in a course in dental assisting conducted in this State and approved by the Board, when such functions are performed under the supervision of a dentist acting as a teacher or instructor who is either duly licensed in North Carolina or qualified for the teaching of dentistry pursuant to the provisions of G.S. 90-29(c)(3).

HISTORY: 1945, c. 639, s. 12; 1971, c. 756, s. 13; 1973, c. 476, s. 128; 1981, c. 824, ss. 2, 3; 1989, c. 727, s. 219(6a); 1997-443, s. 11A.23; 1999-237, s. 11.65; 2007-124, s. 2.

*N.C. Gen. Stat. § 93B-5. Compensation, employment, and training of board members*

…

(g) Within six months of a board member's initial appointment to the board, and at least once within every two calendar years thereafter, a board member shall receive training, either from the board's staff, including its legal advisor, or from an outside educational institution such as the School of Government of the University of North Carolina, on the statutes governing the board and rules adopted by the board, as well as the following State laws, in order to better understand the obligations and limitations of a State agency:

　(1) Chapter 150B, The Administrative Procedure Act.

　(2) Chapter 132, The Public Records Law.

　(3) Article 33C of Chapter 143, The Open Meetings Act.

　(4) Articles 31 and 31A of Chapter 143, The State Tort Claims Act and The Defense of State Employees Law.

　(5) Chapter 138A, The State Government Ethics Act.

　(6) Chapter 120C, Lobbying.

Completion of the training requirements contained in Chapter 138A and Chapter 120C of the General Statutes satisfies the requirements of subdivisions (5) and (6) of this subsection.

HISTORY: 1957, c. 1377, s. 5; 1973, c. 1303, s. 1; c. 1342, s. 1; 1975, c. 765, s. 1; 1981, c. 757, ss. 1, 2; 1991 (Reg. Sess., 1992), c. 1011, s. 1; 2009-125, s. 4.

*N.C. Gen. Stat. § 93B-6. Use of funds for lobbying prohibited*

Occupational licensing boards shall not use any funds to promote or oppose in any manner the passage by the General Assembly of any legislation.

HISTORY: 1973, c. 1302.

*N.C. Gen. Stat. § 93B-16.  Occupational board liability for negligent acts.*

…

(b)    Occupational licensing boards shall be deemed State agencies for purposes of Articles 31 and 31A of Chapter 143 of the General Statutes, and board members and employees of occupational licensing boards shall be considered State employees for purposes of Articles 31 and 31A of Chapter 143 of the General Statutes. To the extent an occupational licensing board purchases commercial liability insurance coverage in excess of one hundred fifty thousand dollars ($ 150,000) per claim for liability arising under Article 31 or 31A of Chapter 143 of the General Statutes, the provisions of G.S. 143-299.4 shall not apply. To the extent that an occupational licensing board purchases commercial insurance coverage for liability arising under Article 31 or 31A of Chapter 143 of the General Statutes, the provisions of G.S. 143-300.6(c) shall not apply.

(c) The purchase of insurance by an occupational licensing board under this section shall not be construed to waive sovereign immunity or any other defense available to the board, its members, officers, employees, or agents in an action or contested matter in any court, agency, or tribunal. The purchase of insurance by an occupational licensing board shall not be construed to alter or expand the limitations on claims or payments established in G.S. 143-299.2 or limit the right of board members, officers, employees, or agents to defense by the State as provided by G.S. 143-300.3.

HISTORY: 2002-168, s. 1.

*N.C. Gen. § 120-76. Powers and duties of the Commission*

The Commission shall have the following powers:

(1) To conduct program evaluation studies of the various components of State agency activity as they relate to:

a. Service benefits of each program relative to expenditures;

b. Achievement of program goals;

c. Use of indicators by which the success or failure of a program may be gauged; and

d. Conformity with legislative intent.

…

HISTORY: 1975, c. 490; 1981, c. 859, s. 87; 1996, 2nd Ex. Sess., c. 18, s. 7.4(a); 1997-443, s. 7.8(e); 2005-276, s. 6.7(a); 2006-203, s. 62; 2007-117, s. 2; 2011-291, s. 1.2(d).

*N.C. Gen. Stat. § 138A-10(a)(10).  Powers and duties*

(a) In addition to other powers and duties specified in this Chapter, the [State Ethics] Commission shall:

…

 (10) Adopt procedures and guidelines to implement this Chapter.

…

HISTORY: 2006-201, s. 1; 2008-213, s. 55; 2008-215, s. 7; 2009-549, s. 8.

*N.C. Gen. Stat. § 138A-12(o).  Inquiries by the [State Ethics] Commission*

…

(o) Recommendations of Sanctions. --  After referring a matter under subsection (k) of this section, if requested by the entity to which the matter was referred, the Commission may recommend sanctions or issue rulings as it deems necessary or appropriate to protect the public interest and ensure compliance with this Chapter. In recommending appropriate sanctions, the Commission may consider the following factors:

(1) The public servant's prior experience in an agency or on a board and prior opportunities to learn the ethical standards for a public servant as set forth in Article 4 of this Chapter, including those dealing with conflicts of interest.

(2) The number of ethics violations.

(3) The severity of the ethics violations.

(4) Whether the ethics violations involve the public servant's financial interest.

(5) Whether the ethics violations were inadvertent or intentional.

(6) Whether the public servant knew or should have known that the improper conduct was a violation of this Chapter.

(7) Whether the public servant has previously been advised or warned by the Commission.

(8) Whether the conduct or situation giving rise to the ethics violation was pointed out to the public servant in the Commission's Statement of Economic Interest evaluation letter issued under G.S. 138A-24(e).

(9) The public servant's motivation or reason for the improper conduct or action, including whether the action was for personal financial gain versus protection of the public interest.

In making recommendations under this subsection, if the Commission determines, after proper review and investigation, that sanctions are appropriate, the Commission may recommend any action it deems necessary to properly address and rectify any violation of this Chapter by a public servant, including removal of the public servant from the public servant's State position. Nothing in this subsection is intended, and shall not be construed, to give the Commission any independent civil, criminal, or administrative investigative or enforcement authority over covered persons, or other State employees or appointees.

…

HISTORY: 2006-201, s. 1; 2007-348, ss. 27-30; 2008-187, s. 21; 2008-213, ss. 1(b), 57; 2008-215, ss. 4, 5; 2009-549, ss. 9, 10, 11; 2010-169, s. 23(a)-(e), (h).

*N.C. Gen. Stat. § 138A-14(b). Ethics education program*

…

(b) The [N.C. State Ethics] Commission shall offer basic ethics education and awareness presentations to all public servants and their immediate staffs, upon their election, appointment, or employment, and shall offer periodic refresher presentations as the Commission deems appropriate. Every public servant shall participate in an ethics presentation approved by the Commission within six months of the public servant's election, reelection, appointment, or employment, and shall attend refresher ethics education presentations at least every two years thereafter in a manner as the Commission deems appropriate.

…

HISTORY: 2006-201, s. 1; 2007-347, s. 9(a); 2008-213, ss. 59, 60; 2009-10, s. 4; 2009-549, s. 12; 2010-169, s. 22(a).

*N.C. Gen. Stat. § 138A-15(d).  Duties of heads of State agencies*

…

(d) The head of each State agency, including the chair of each board subject to this Chapter, shall periodically remind public servants under that individual's authority of the public servant's duties to the public under the ethical standards and rules of conduct in this Chapter, including the duty of each public servant to continually monitor, evaluate, and manage the public servant's personal, financial, and professional affairs to ensure the absence of conflicts of interest.

…

HISTORY: 2006-201, s. 1; 2007-347, s. 9(b); 2008-213, ss. 61, 62.

*N.C. Gen. Stat. § 138A-21. Purpose*

   The purpose of disclosure of the financial and personal interests by covered persons is to assist covered persons and those who appoint, elect, hire, supervise, or advise them identify and avoid conflicts of interest and potential conflicts of interest between the covered person's private interests and the covered person's

public duties. It is critical to this process that current and prospective covered persons examine, evaluate, and disclose those personal and financial interests that could be or cause a conflict of interest or potential conflict of interest between the covered person's private interests and the covered person's public duties. Covered persons must take an active, thorough, and conscientious role in the disclosure and review process, including having a complete knowledge of how the covered person's public position or duties might impact the covered person's private interests. Covered persons have an affirmative duty to provide any and all information that a reasonable person would conclude is necessary to carry out the purposes of this Chapter and to fully disclose any conflict of interest or potential conflict of interest between the covered person's public and private interests, but the disclosure, review, and evaluation process is not intended to result in the disclosure of unnecessary or irrelevant personal information.

HISTORY: 2006-201, s. 1; 2008-213, s. 63.

*N.C. Gen. Stat. § 138A-27.  Penalty for false information*

A filing person who provides false information on a statement of economic interest as required under this Article knowing that the information is false is guilty of a Class H felony and shall be subject to disciplinary action under G.S. 138A-45.

HISTORY: 2006-201, s. 1.

*N.C. Gen. Stat. § 138A-31. Use of public position for private gain*

(a) Except as permitted under G.S. 138A-38, a covered person or legislative employee shall not knowingly use the covered person's or legislative employee's public position in an official action or legislative action that will result in financial benefit to the covered person or legislative employee, a member of the covered person's or legislative employee's extended family, or business with which the covered person or legislative employee is associated. This subsection shall not apply to financial or other benefits derived by a covered person or legislative employee that the covered person or legislative employee would enjoy to an extent no greater than that which other citizens of the State would or could enjoy, or that are so remote, tenuous, insignificant, or speculative that a reasonable person would conclude under the circumstances that the covered person's or legislative employee's ability to protect the public interest and perform the covered person's or legislative employee's official duties would not be compromised.

(b) A covered person shall not mention or authorize another person to mention the covered person's public position in nongovernmental advertising that advances the private interest of the covered person or others. The prohibition in this subsection shall not apply to any of the following:

  (1) Political advertising.

  (2) News stories and articles.

  (3) The inclusion of a covered person's public position in a directory or a biographical listing.

  (4) The inclusion of a covered person's public position in an agenda or other document related to a meeting, conference, or similar event when the disclosure could reasonably be considered material by an individual attending the meeting, conference, or similar event.

  (5) The inclusion of a covered person's public position in a charitable solicitation for a nonprofit business entity qualifying under 26 U.S.C. § 501(c)(3).

  (6) The disclosure of a covered person's position to an existing or prospective customer, supplier, or client when the disclosure could reasonably be considered material by the customer, supplier, or client.

(c) Notwithstanding G.S. 163-278.16A, no covered person shall use or permit the use of State funds for any advertisement or public service announcement in a newspaper, on radio, television, magazines, or billboards, that contains that covered person's name, picture, or voice, except in case of State or national emergency and only if the announcement is reasonably necessary to the covered person's official function. This subsection shall not apply to fund-raising on behalf of and aired on public radio or public television.

HISTORY: 2006-201, s. 1; 2009-549, s. 16; 2011-393, s. 1.

*N.C. Gen. Stat. § 138A-34. Use of information for private gain*

  A public servant or legislative employee shall not use or disclose nonpublic information gained in the course of, or by reason of, the public servant's or legislative employee's official responsibilities in a way that would affect a personal

85

financial interest of the public servant or legislative employee, a member of the public servant's or legislative employee's extended family, or a person or governmental unit with whom or business with which the public servant or legislative employee is associated. A public servant or legislative employee shall not improperly use or improperly disclose any confidential information.

HISTORY: 2006-201, s. 1; 2008-213, s. 83.

*N.C. Gen. Stat. § 138A-39. Disqualification to serve*

(a) Within 30 days of notice of the [N.C. State Ethics] Commission's determination that a public servant has a disqualifying conflict of interest, the public servant shall eliminate the interest that constitutes the disqualifying conflict of interest or resign from the public position.

(b) Failure by a public servant to comply with subsection (a) of this section is a violation of this Chapter for purposes of G.S. 138A-45.

(c) A decision under this section shall be considered a final decision for contested case purposes under Article 3 of Chapter 150B of the General Statutes.

(d) As used in this section, a disqualifying conflict of interest is a conflict of interest of such significance that the conflict of interest would prevent a public servant from fulfilling a substantial function or portion of the public servant's public duties.

HISTORY: 2006-201, s. 1.

*N.C. Gen. Stat. § 138A-45. Violation [of State Government Ethics Act] consequences*

(a) Violation of this Chapter by any covered person or legislative employee is grounds for disciplinary action. Except as specifically provided in this Chapter and for perjury under G.S. 138A-12 and G.S. 138A-24, no criminal penalty shall attach for any violation of this Chapter.

…

(g) The Commission may seek to enjoin violations of G.S. 138A-34.

86

HISTORY: 2006-201, s. 1.

*N.C. Gen. Stat. § 143-300.3. Defense of State employees*

Except as otherwise provided in G.S. 143-300.4, upon request of an employee or former employee, the State may provide for the defense of any civil or criminal action or proceeding brought against him in his official or individual capacity, or both, on account of an act done or omission made in the scope and course of his employment as a State employee.

HISTORY: 1967, c. 1092, s. 1.

*N.C. Gen. Stat. § 143-318.9. Public policy*

Whereas the public bodies that administer the legislative, policy-making, quasi-judicial, administrative, and advisory functions of North Carolina and its political subdivisions exist solely to conduct the people's business, it is the public policy of North Carolina that the hearings, deliberations, and actions of these bodies be conducted openly.

HISTORY: 1979, c. 655, s. 1.

*N.C. Gen. Stat. § 150B-4(a). Declaratory rulings*

(a) On request of a person aggrieved, an agency shall issue a declaratory ruling as to the validity of a rule or as to the applicability to a given state of facts of a statute administered by the agency or of a rule or order of the agency. Upon request, an agency shall also issue a declaratory ruling to resolve a conflict or inconsistency within the agency regarding an interpretation of the law or a rule adopted by the agency. The agency shall prescribe in its rules the procedure for requesting a declaratory ruling and the circumstances in which rulings shall or shall not be issued. A declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by the court. An agency may not retroactively change a declaratory ruling, but nothing in this section prevents an agency from prospectively changing a declaratory ruling.

(a1) An agency shall respond to a request for a declaratory ruling as follows:

(1) Within 30 days of receipt of the request for a declaratory ruling, the agency

87

shall make a written decision to grant or deny the request. If the agency fails to make a written decision to grant or deny the request within 30 days, the failure shall be deemed a decision to deny the request.

(2) If the agency denies the request, the decision is immediately subject to judicial review in accordance with Article 4 of this Chapter.

(3) If the agency grants the request, the agency shall issue a written ruling on the merits within 45 days of the decision to grant the request. A declaratory ruling is subject to judicial review in accordance with Article 4 of this Chapter.

(4) If the agency fails to issue a declaratory ruling within 45 days, the failure shall be deemed a denial on the merits, and the person aggrieved may seek judicial review pursuant to Article 4 of this Chapter. Upon review of an agency's failure to issue a declaratory ruling, the court shall not consider any basis for the denial that was not presented in writing to the person aggrieved.

…

HISTORY: 1973, c. 1331, s. 1; 1985, c. 746, s. 1; 1991, c. 418, s. 4; c. 477, s. 2.1; 1997-34, s. 1; 2011-398, s. 56.

*N.C. Gen. Stat. § 150B-23. Commencement; assignment of administrative law judge; hearing required; notice; intervention*

(a) A contested case shall be commenced by paying a fee in an amount established in G.S. 150B-23.2 and by filing a petition with the Office of Administrative Hearings and, except as provided in Article 3A of this Chapter, shall be conducted by that Office. The party who files the petition shall serve a copy of the petition on all other parties and, if the dispute concerns a license, the person who holds the license. A party who files a petition shall file a certificate of service together with the petition. A petition shall be signed by a party or a representative of the party and, if filed by a party other than an agency, shall state facts tending to establish that the agency named as the respondent has deprived the petitioner of property, has ordered the petitioner to pay a fine or civil penalty, or has otherwise substantially prejudiced the petitioner's rights and that the agency:

(1) Exceeded its authority or jurisdiction;

(2) Acted erroneously;

88

(3) Failed to use proper procedure;

(4) Acted arbitrarily or capriciously; or

(5) Failed to act as required by law or rule.

The parties in a contested case shall be given an opportunity for a hearing without undue delay. Any person aggrieved may commence a contested case hereunder.

A local government employee, applicant for employment, or former employee to whom Chapter 126 of the General Statutes applies may commence a contested case under this Article in the same manner as any other petitioner. The case shall be conducted in the same manner as other contested cases under this Article.

…

HISTORY: 1973, c. 1331, s. 1; 1975, 2nd Sess., c. 983, s. 65; 1985, c. 746, s. 1; 1985 (Reg. Sess., 1986), c. 1022, ss. 1(9), (10), 6(2), (3); 1987, c. 878, ss. 3-5; c. 879, s. 6.1; 1987 (Reg. Sess., 1988), c. 1111, s. 5; 1991, c. 35, s. 1; 1993 (Reg. Sess., 1994), c. 572, s. 2; 2009-451, s. 21A.1(a); 2011-332, s. 2.1; 2011-398, s. 16.

<u>North Carolina Regulations</u>

21 N.C.A.C. 16N.0402

.0402 SUBMISSION OF REQUEST FOR RULING

All requests for declaratory rulings shall be written and mailed to the Board's office. The envelope containing the request should bear the notation: REQUEST FOR DECLARATORY RULING. The request must include the following information:

(1) Name and address of petitioner;

(2) Statute or rule to which petition relates;

(3) Concise statement of the manner in which petitioner is aggrieved by the rule or statute or its potential application to him; and

(4) A statement of whether an oral hearing is desired and if so, the reason therefor.

Statutory Authority G.S. 150B-17;

NOTES:
History Note:
   Eff. August 25, 1977;
   Amended Eff. May 1, 1989; October 1, 1986; March 1, 1985.

### 21 N.C.A.C. 16U.0201

.0201 PROCESSING

   Licensees shall be notified of patient complaints against them and given an opportunity to respond except:

(1) In cases requiring emergency action for the protection of the public health, safety or welfare; or

(2) In cases where notification may jeopardize the preservation or procurement of relevant evidence.

Authority G.S. 90-28; 90-41; 90-41.1; 90-48; 90-223; 90-231; 150B-41;

NOTES:
History Note:
   Eff. October 1, 1996.